[Nos. A147877, A149683. First Dist., Div. Four. Mar. 17, 2017.]

In re Matthew C., a Person Coming Under the Juvenile Court Law.
SAN FRANCISCO HUMAN SERVICES AGENCY, Plaintiff and
Respondent, v.
STEPHANIE M., Defendant and Appellant.
STEPHANIE M., Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
SAN FRANCISCO HUMAN SERVICES AGENCY et al., Real Parties in
Interest.

## Counsel

Nicole Williams and Mariko Nakanishi for Defendant and Appellant and for Petitioner.

No appearance for Respondent Superior Court.

Dennis J. Herrera, City Attorney, Kimiko Burton, Lead Attorney; Gordon-Creed, Kelley Holl & Sugarman, Jeremy Sugarman and Ada Lau for Plaintiff and Respondent and for Real Parties in Interest.

## Opinion

**REARDON, J.**—In these consolidated dependency actions, Stephanie M. (mother) contests the juvenile court's detention and dispositional orders temporarily denying her visitation with her young son—Matthew C. (born Oct. 2015). Specifically, she argues that the juvenile court abused its discretion in suspending visitation between mother and son because there was no evidence that monitored visitation would have been contrary to the minor's

safety. In addition, mother challenges by writ petition the juvenile court's October 2016 decision to terminate her reunification services with respect to Matthew and refer the boy for permanency planning pursuant to section 366.26 of the Welfare and Institutions Code.[1] In particular, mother disputes the evidentiary bases for the juvenile court's findings that she failed to participate regularly and make substantive progress in court-ordered treatment, that there was no substantial probability that Matthew could be returned to her care within statutory timeframes, and that reasonable services were provided to her. In the published portion of this opinion, we join the Third District in concluding that parental visitation may be denied during the reunification period if such visitation would be inconsistent with the physical or emotional well-being of the child. (See *In re T.M.* (2016) 4 Cal.App.5th 1214 [209 Cal.Rptr.3d 391] (*T.M.*).) Using this standard, we affirm the juvenile court's challenged visitation orders. In the unpublished portions of this opinion, we consider and deny mother's writ petition.

## I. BACKGROUND

### A. *Initial Dependency Proceedings*

On October 23, 2015, the San Francisco Human Services Agency (Agency) filed a dependency petition pursuant to subdivisions (b) and (j) of section 300, alleging that Matthew C.—the minor who is the subject of these proceedings—had suffered, or was at substantial risk of suffering, serious physical harm or illness due to his parents' substance abuse and domestic violence.[2] In addition, the petition alleged that mother had three older children, none of whom were in her care. Specifically, mother's daughter was in a legal guardianship with the maternal grandmother; her oldest son had an open dependency case in Santa Clara County where he was residing in a residential program under a permanent plan of long-term foster care; and the youngest of the three, also a son, had been privately adopted.

In its detention report filed the same day as the petition, the Agency stated that the police—responding to a domestic disturbance call on October 20, 2015, at approximately 2:00 a.m.—found mother and father drunk. According to mother, after a few hours of verbal attacks, father had slapped her three times across the face. She had punched him on the cheek, leaving a mark. All of this occurred within three feet of newborn Matthew and despite the fact that mother had an active restraining order against father.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. All rule references are to the California Rules of Court. On our own motion, we consolidated these matters for decision on January 6, 2017.

[2] Per mother's report, Matthew C. (father) is the biological father of Matthew. Father was declared to be Matthew's presumed father on October 26, 2015. He is not involved in these appellate proceedings.

When mother and father were interviewed by Agency social workers the morning after the domestic dispute, both parents still appeared to be under the influence. Moreover, as the social workers approached the residence, father was seen outside with a 40-ounce beer, yelling " 'take the baby away from her. She doesn't deserve it.' " That same day, father was arrested for disorderly conduct and public intoxication. Mother reported that father had had a drinking problem for as long as she had known him (approximately two years), but claimed that she had been sober for about a year. Prior to that time, mother had convictions for misdemeanor public intoxication in November 2013 and July 2014. In addition, mother had previously been diagnosed with bipolar disorder.

At the initial detention hearing on October 26, 2015, the juvenile court temporarily detained Matthew in foster care and continued the matter to the next day for further hearing. On October 27, the court confirmed the previous detention orders, made visitation orders, and authorized the Agency to release Matthew to mother at a residential treatment program, with the understanding that she would not leave the program with the child.

In its combined jurisdictional and dispositional report dated November 12, 2015, the Agency recommended that Matthew be declared a juvenile court dependent and that he reside with mother in residential treatment under a family maintenance plan. The Agency also provided some additional background with respect to mother's drinking and mental health concerns. On the issue of mental health, mother reported that she was originally diagnosed with bipolar disorder when she was 15. Although she was prescribed medication, she did not take it as directed because she did not believe she needed it. Rather, she ascribed her out-of-control behaviors to teenage rebellion. After the petition in this matter was filed, mother entered the Jelani House residential treatment program on October 31, 2015, and discussed her mental health history with the staff psychiatrist there. According to mother, both she and the psychiatrist felt that a diagnosis of severe anxiety was more fitting, and thus mother was given a prescription to treat that condition.

With respect to her drinking, mother had gastric bypass surgery in 2008 and began drinking excessively in 2009 in the wake of her divorce. She had a history of homelessness since that time. Mother admitted that she was aware that she was not supposed to drink alcohol after a gastric bypass because the body absorbs it in an unhealthy manner. Nevertheless, mother continued to drink, stating that the only times she made conscious efforts to reduce or discontinue her consistent use were during her two most recent pregnancies. Mother admitted, however, that, while pregnant with Matthew, she had relapsed a "couple of times."

Moreover, mother acknowledged that spending time with father was a catalyst for her drinking. In the early stages of her pregnancy with Matthew, she reported going to a five-day detox program, to Safe Harbor for a month, and then to a three-month program in Santa Clara County, which helped her maintain her sobriety by offering her housing stability. Mother conceded that, during this time, father was in and out of jail, which added to her ability to remain sober. Nevertheless, mother reunited with father once he got out of jail, in hopes that they could be a family.

Mother also minimized the domestic violence occurring between the couple, despite the fact that, at the time of detention, there were four active restraining orders against father which named mother as the protected person. Further, although father had been convicted in March and June 2015 for restraining order violations, mother claimed not to remember the details of the incidents and downplayed their significance. Finally, father also had a history of domestic violence with other partners, with convictions in 2005 and 2012, as well as a conviction for willful cruelty to a child in 2008.

On the other hand, once Matthew was detained, mother took quick steps to enter a residential treatment program to address her substance abuse and separate herself from father. Further, neither mother nor Matthew tested positive for any substances at the time of the minor's birth, mother had received consistent prenatal care for Matthew, and mother cared for the infant in the first days of his life. In addition, mother expressed her desire to abide by the terms of the restraining order and, if necessary, to prioritize her son above her relationship with father. Finally, according to the social worker, mother acknowledged the seriousness of domestic violence in any relationship, and an "in-depth conversation" was had with mother "regarding the potential disastrous outcome of another domestic violence incident in the presence of her young child." On this basis, the Agency recommended that Matthew be placed with mother under a family maintenance plan, on the condition that mother continued to reside in a residential treatment program.

At the combined jurisdictional and dispositional hearing on November 17, 2015, the juvenile court—after making certain alterations to the petition—determined the allegations in the amended petition to be true and found Matthew to be a child described by subdivisions (b) and (j) of section 300. Thereafter, the court declared Matthew to be a juvenile court dependent and placed him with mother under a family maintenance plan. This in-home placement was expressly contingent on mother remaining at, and in compliance with, her residential program. Further, mother was ordered to engage in a service plan that, in addition to requiring completion of a residential drug treatment program, included participation in a domestic violence support group, individual therapy addressing trauma and domestic violence, and

treatment by a qualified mental health professional. "Supportive services" were recommended for father as the noncustodial parent. A six-month review was set for May 2016.

## B. *The Supplemental Petition*

Unfortunately, less than a month later, on December 3, 2015, the Agency filed a supplemental petition seeking detention of Matthew after mother left residential treatment with the minor in late November and never returned. According to the detention report filed that same day, mother had remained sober for approximately two weeks—from October 31 to November 19—in residential treatment at Jelani House, before transferring to another treatment facility, Women's Hope. Matthew was returned to mother's custody on November 17 under her family maintenance plan and both mother and son moved to Women's Hope on November 20, 2015. Shortly thereafter, mother was authorized by staff to take Matthew on a day pass for Thanksgiving (Nov. 26) and never returned with the minor. According to staff, other residents at mother's treatment facility reported that mother was in a hotel in San Francisco and was drinking and using drugs. Mother had also reportedly stated that she was "sick of her son" and was not feeding him.

Several days later, on November 29, 2015, six-week-old Matthew was found abandoned in a Starbucks at the Great Mall in Milpitas. He was left in a stroller, which also contained a half-full bottle of vodka, a few baby items, a journal, and a dependency drug court reminder with mother's name on it. Matthew's physical condition was "very poor." He was not properly dressed for the weather, his diaper was soiled, and his clothes were soaking wet. He was also extremely hungry, immediately drinking two bottles when they were offered. After he was transported for medical evaluation, hospital staff assessed that Matthew had a diaper rash, a lesion in a fold on his upper leg, scalding burns on both of his legs which were determined to be nonaccidental, and an adult human bite mark on his lower left leg.

Apparently, mother and Matthew had reunited with father despite the active restraining orders precluding father from having contact with mother. At a different location on November 29, mother and father were stopped by the police, as they were intoxicated in public and had been arguing. Once it was determined that they were the parents of the abandoned baby, mother and father were interviewed separately. Each gave different stories regarding Matthew's whereabouts. Mother, for instance, claimed that, after she and father had argued that morning, she left the baby with him. She stated that father later told her that he gave the baby to his sister or possibly to his ex-wife. Mother then met up with father again about 1:00 p.m. and they started drinking until the police intervened. In contrast, although the police

had not told father where Mathew was found, father averred that mother had called him earlier that day, stating that she had abandoned the baby at a Starbucks. Father was eventually taken to jail for violating the restraining order against him.

Mother next appeared at Jelani House late on the evening of December 1, 2015. Because she was drunk and reported being badly beaten and bitten by father, staff allowed her to stay the night before she was taken to the hospital for detoxification. Reportedly, she brought a bottle of vodka with her to the hospital under her jacket. When the social worker spoke to her in the emergency ward on December 2, however, mother stated that she was going to go into a program and get her baby back.

At the detention hearing on December 4, 2015, mother was not present as she remained hospitalized. She had been in contact with her attorney, however, and agreed to submit to detention. The juvenile court detained Matthew. Thereafter, it refused to order visitation between mother and son, concluding that, at that point, it would be detrimental to the best interest of the child to have any contact with mother.

In its dispositional report on the supplemental petition, filed January 25, 2016, the Agency again related mother's history of drinking and mental health issues. The Agency also stressed that mother had been court ordered to complete a substance abuse program on at least two occasions as a condition of probation, but had failed to do so. In addition, most recently, she had been involved in Jelani House, Women's Hope, and the Avenues for treatment, but did not complete any of those programs. Indeed, although mother went to the Avenues, a mental health program, after Matthew was detained for the second time and could have stayed there for two weeks, she chose instead to leave in order to reunite with father upon his release from jail. Reportedly, mother told staff at the Avenues that she was going to return to father, despite the restraining orders, because she wanted to be a family with him. Moreover, while in the program, she showed "no openness nor willingness to engage in services." Mother had not been in touch with the social worker since she left the Avenues. The Agency opined that mother needed to be sober before she could begin to face her domestic violence and mental health issues.

In the meantime, when the minor came into shelter care after being rescued by the police, he was so hungry he drank three six-ounce bottles of formula in rapid succession. When his foster mother had to change the dressings on his burn and bite marks, he screamed in pain, leading the social worker to comment that the tiny infant had had a "tremendous amount of physical suffering to endure." Moreover, when Matthew came into foster care, he was irritable, fussy, and unhappy. However, since that time, he had gained weight, grown quickly, and become calm and happy.

Jurisdiction and disposition on the supplemental petition proceeded on January 26, 2016. Although noticed, neither parent was present. Mother's attorney asked for a continuance, reporting that she had received a message from mother, the day before, indicating that she was ill and could not attend. The court denied the request, noting that "it's time to proceed because the baby really needs an expeditious resolution to this matter." Indeed, the court saw no good cause for a continuance and expressly found that the nonappearance of both parents was willful. After certain amendments were made to the petition, the juvenile court found the amended allegations true. The court also made dispositional findings and orders, which included the provision of reunification services for both parents. The reunification plan ordered for mother included completion of a residential dual diagnosis mental health and drug treatment program; obtaining and maintaining suitable housing; participation in both a psychiatric and a psychological evaluation; compliance with a mental health professional's recommendations for therapy and medication; and compliance with the restraining order. The court, however, refused to authorize visitation between mother and Matthew as part of the reunification plan, reasoning that mother needed to show some type of progress on her many issues before it would be willing to change its detriment finding. A six-month review was set for July 2016.

## C. Mother's Section 388 Petition

About three weeks later, on February 19, 2016, mother filed a petition pursuant to section 388, arguing that her situation had improved such that she should now be allowed supervised visitation with Matthew. Specifically, mother reported that she had been at HealthRIGHT360, a dual diagnosis residential program, since February 3, 2016, and was compliant with the program. Prior to entering treatment, she had been in a related detoxification program from January 29 to February 3, 2016.[3] She was also in at least weekly contact with her case managers at the Homeless Prenatal Program (HPP) and cooperating with her Agency social worker. Moreover, mother asserted that she was attending weekly therapy through her treatment program and was compliant with her psychotropic medications. She also claimed to understand the negative impacts of domestic violence and stated her intention to abide by the restraining order put in place to protect her. Mother requested supervised visitation with Matthew a minimum of six hours per week. She argued that such visitation would be in the minor's best interests because it would help support a healthy bond and attachment and would help mother successfully reunify.

---

[3] Father later filed a declaration indicating that he had been arrested for a domestic violence incident involving mother on January 29. Thus, mother's desire to seek treatment appears to have again coincided with father's unavailability through incarceration.

On March 17, 2016, the juvenile court granted mother's section 388 petition and ordered supervised visitation between mother and Matthew a minimum of three hours per week, pending the start of therapeutic visitation.[4] The court also confirmed the six-month review date in July 2016. On March 25, 2016, mother filed a notice of appeal challenging the juvenile court's detention orders of December 4, 2015, and jurisdictional and dispositional orders of January 26, 2016, "including orders denying visitation for mother." (A149683).

D. *The Sixth-Month Review**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. DISCUSSION

A. *Denial of Visitation*

As mentioned above, mother challenges on appeal the juvenile court's orders at both detention and disposition on the supplemental petition, which temporarily denied her visitation with Matthew. At each of the two hearings at issue, the juvenile court refused to order visitation based on its conclusion that such contact would be detrimental to the minor. Mother argues that there was absolutely no evidence that monitored visitation would be inconsistent with the infant's well-being and that the absence of visitation negatively impacted her ability to forge a loving and close bond with the minor.[6]

 As it turns out, the standards for denying visitation in this context are not as clear cut as one might expect. With respect to disposition, subdivision (a)(1) of section 362.1 provides that any order placing a child in foster care and ordering reunification services must provide for visitation between parent and child, subject to two caveats. First, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) Second, "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (*Id.*, subd. (a)(1)(A).) According to the statute, these visitation requirements exist

---

[4] In her appeal, mother filed a request for judicial notice of the juvenile court's March 17 minute order granting her request for supervised visitation. By order dated August 3, 2016, we indicated that we would consider mother's unopposed request with the merits of the appeal. As we have since consolidated the appeal with mother's subsequent writ petition and the consolidated record includes the minute order at issue, we deny mother's request as moot.

*See footnote, *ante*, page 1090.

[6] The Agency urges us to dismiss mother's appeal as moot because the juvenile court reinstated mother's visitation approximately three months later, on March 17, 2016, in response to a petition under section 388. However, we will reach the merits of mother's claim because it is arguably relevant to the arguments made in her writ petition that additional services should have been provided to her.

"[i]n order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent." (*Id.*, subd. (a).)

There is currently a split of authority as to whether section 362.1 mandates visitation absent evidence of a threat to the minor's *physical* safety (see, e.g., *In re C.C.* (2009) 172 Cal.App.4th 1481, 1491–1492 [92 Cal.Rptr.3d 168] (*C.C.*)) or whether courts may also deny visitation based on potential harm to the minor's *emotional* well-being (see, e.g., *T.M.*, *supra*, 4 Cal.App.5th at pp. 1219–1220).[7] The Second District in *C.C.*, for example, reasoned that a "strict legislative limitation on suspending or denying all parental visitation during the reunification period is no accident: Without visitation of some sort, it is virtually impossible for a parent to achieve reunification." (*C.C.*, *supra*, 172 Cal.App.4th at p. 1491.) It thus construed the language of the statute to mean that "when reunification services have been ordered and are still being provided . . . some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety*. The frequency of such visits, in contrast, depends on a broader assessment by the court of the child's 'well-being.' " (*Ibid.*, fn. omitted.) Applying this standard to the facts of the case, the *C.C.* court concluded that the record did not support the existence of a threat to C.C.'s safety, where there was only an isolated reference that the minor might harm himself and there was no evidence that the minor's mother presented any threat to his physical safety during monitored visitation in a therapeutic setting. (*Id.* at p. 1492.)

More recently, in *T.M.*, *supra*, 4 Cal.App.5th 1214, the Third District rejected the approach espoused by *C.C.* (*T.M.*, *supra*, 4 Cal.App.5th at p. 1219.) Instead, it reasoned that, "[i]n addition to requiring a court to deny visitation if the child's safety is at risk, the plain language of section 362.1, subdivision (a) only requires visitation as frequently as the well-being of the child allows. Accordingly, if visitation is not consistent with the well-being of the child, the juvenile court has the discretion to deny such contact. As courts have explained, 'well-being' includes the minor's emotional and physical health." (*Ibid.*) In *T.M.*, the child welfare agency recommended against visitation with a father who had subjected the minor to " 'extreme physical abuse,' " causing the minor to be very afraid of him. (*Id.* at p. 1217.)

---

[7] There also appears to be some disagreement as to the appropriate standard of review in these matters. Specifically, some courts have applied the substantial evidence test, others have reviewed for abuse of discretion, and still others have applied a blended standard, finding no abuse of discretion where substantial evidence supports the order. (See *T.M.*, *supra*, 4 Cal.App.5th at pp. 1219–1221 [collecting cases and applying a blended standard].) Not long ago, we noted that it is unclear "whether the two standards are so different in this context." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1092, fn. 7 [158 Cal.Rptr.3d 915].) And indeed, we need not reach this issue, as we would come to the same conclusion under any of the articulated standards.

Applying the standard set forth above—essentially a detriment test—the *T.M.* court affirmed the juvenile court's order suspending visitation, which provided: " '[V]isitation between the child and father is detrimental until said time as the progress has been made in individual counseling and the child's safety can be assured during the course of visitation in a therapeutic setting and with the conjoint counseling.' " (*Id.* at p. 1218; see *id.* at pp. 1219–1221.)

■ There is much to recommend the approach taken by the court in *T.M.* For instance, as the *T.M.* court, itself, acknowledged, its "reading of the statute is consistent with dependency law's guiding principle of the well-being of the child: 'While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' " (*T.M., supra,* 4 Cal.App.5th at p. 1220.) Under the *C.C.* test, in contrast, the juvenile court lacks the power to suspend visits harmful to a child's emotional well-being and thus the court " 'would be required to sit idly by while a child suffered extreme emotional damage caused by ongoing visits.' " (*Ibid.,* quoting *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357 [120 Cal.Rptr.3d 338].) It seems exceedingly unlikely that such emotionally traumatic visits would do anything to advance a parent's reunification prospects, and, indeed, they might very well derail them.

■ Moreover, a visitation ban could almost always be reimagined as an order for infrequent or conditional visitation. Thus, a juvenile court could easily avoid the more stringent test imposed by *C.C.* (and set forth in subd. (a)(1)(B) of § 362.1) in favor of the general detriment standard advanced by *T.M.* (and set forth in subd. (a)(1)(A) of § 362.1) simply by reworking its visitation order. For example, the court in this case could have ordered supervised visitation once per week, to commence upon proof that mother had stabilized in treatment. Our review of this "frequency" order would then clearly have been for consistency with the well-being of the minor pursuant to subdivision (a)(1)(A) of section 362.1. It makes no sense to subject identical situations to different standards based on word choice. Rather, we believe that the prohibition on parent-child visitation where there is a safety concern is best understood as marking the outer boundary of the juvenile court's discretion in setting the terms for visitation during the reunification period, where a presumption in favor of frequent visitation exists. So long as the juvenile court does not jeopardize the minor's safety, it is free to craft a visitation order consistent with the minor's well-being and the parents' presumed desire for frequent contact. We therefore join *T.M.* in concluding that a juvenile court may suspend or deny visitation pursuant to section 362.1, subdivision (a), if such visitation would be inconsistent with the physical or emotional well-being of the child.

■ In addition, we further conclude that the standards for denial of visitation at detention are similar to those we have just articulated for the suspension of visitation during the reunification period. With respect to detention hearings, subdivision (e) of section 319 provides that, if the juvenile court orders a minor detained, it shall also "order services to be provided as soon as possible to reunify the child and his or her family if appropriate." And, our rules of court indicate that, at a detention hearing, "[t]he court must consider the issue of visitation between the child and other persons, determine if contact pending the jurisdiction hearing would be beneficial or detrimental to the child, and make appropriate orders." (Rule 5.670(c)(1).) Thus, it appears that parental visitation can be denied at detention based on a basic detriment finding. Indeed, the juvenile court may have even more leeway in this context to protect a minor's well-being, as reunification services need only be ordered "if appropriate." (§ 319, subd. (e).) This makes some sense, as the situation at detention is often very fluid, all of the facts and circumstances are generally not known, and any out-of-home placement order is, by definition, temporary.

Turning to the specific facts relevant here, we note that, at the detention hearing on December 4, 2015, mother was not present as she remained hospitalized. Mother's attorney, however, requested visitation between mother and son. The Agency responded: "Your Honor, given the facts of this case, I am going to ask at this time that a finding be made that visitation be detrimental to this child." The court replied: "I would *certainly* enter that finding" (italics added). Although mother's attorney pressed the issue, arguing that there was no evidence that supervised visitation would create any issues, the court reiterated its finding, stating: "I think it would be detrimental to the best interest of the child to have any contact with mother at this particular point."

We have no difficulty upholding the juvenile court's order suspending visitation as of the detention hearing. At that point, mother was still hospitalized after having been badly beaten by father, and her condition was unknown. Moreover, it was unclear whether it was mother or father who had intentionally burned and bitten the minor, thereafter abandoning him at the Starbucks in "very poor" condition. If mother was responsible for these odious and life-threatening actions, she showed an utter disregard for the well-being of her six-week-old son and clearly represented a physical and emotional threat to him, at least until her current situation could be assessed. Moreover, even if father was responsible for all of the specific abuse, mother's conduct still showed a gross lack of concern for Matthew's safety and well-being. First, she made the sober decision to leave treatment with Matthew and reunite with father against court orders and despite the fact that she had previously been counseled "in-depth . . . regarding the potential disastrous outcome of another domestic violence incident in the presence of

her young child." Second, she decided to resume drinking while caring for the minor, reportedly stating during this timeframe that she was sick of her son and was not feeding him. Subsequently, after learning her child had been found abandoned, mother nevertheless continued to drink, even attempting to bring a bottle of vodka with her to the hospital. In short, mother's behavior was completely out of control and represented a continued threat both to herself and to her young son, regardless of the setting. (Cf. *T.M., supra,* 4 Cal.App.5th at p. 1218 [in suspending visitation, the juvenile court noted that the father was "unable 'to control himself in any setting' "].) Finally and importantly, Matthew was seriously injured, and thus it was reasonable for the court to conclude that the infant should not be subjected to any additional stress during his healing process. These circumstances more than amply support the juvenile court's conclusion as of the detention hearing that visitation would be detrimental to Matthew.

With respect to the court's dispositional visitation order, both jurisdiction and disposition on the supplemental petition proceeded on January 26, 2016. Although noticed, neither parent was present. At the hearing, there was some discussion that supervised visitation would now be appropriate since mother was being offered a reunification plan. However, when the court asked for the Agency's position on visitation, the social worker opined: "I don't think she should have visitation until we take a look at her because—well, from conversations I've had, I'm afraid she might be the person who bit the baby as well as burn[ed] the baby." The social worker further stated: "I think I need to talk to her and determine who did the biting of the baby, because apparently she's bitten the father too and left a big bite mark on him. I don't want the baby to be injured. No matter how much the supervising . . . [,] [¶] . . . [t]hey're not going to grab the kid out of her hands."

The juvenile court denied the request for visitation, reasoning that mother "needs to really be in a live-in residential treatment program." The court further elaborated: "She seems to think that domestic violence isn't the main issue, and it's one of the main issues, not that that—I mean, I think that she needs to understand the danger she puts herself in and the child in. And substance abuse is another extremely big issue, and obviously her mental health condition. *So until there is some progress,* however, we're going to define that, I am going to deny that request" (italics added). Although mother's attorney argued that, with appropriate supervision, the child could be ensured to be safe with mother, the juvenile court reiterated that mother needed "to show progress with herself first" and thus it would not "change the detriment findings *for today"* (italics added).

 Again, we have little difficulty affirming the juvenile court's continued suspension of visitation based on the evidence presented. At the time of

the dispositional hearing, mother was essentially on the lam. After Matthew was abandoned and detained for the second time in December, mother was admitted to the Avenues, a mental health program, where she could have stayed for two weeks. Instead—even after everything that had happened—she chose to leave in order to reunite with father upon his release from jail. Moreover, while in the program, she showed "no openness nor willingness to engage in services." In addition, she had not been in touch with the social worker since she left the Avenues. Presumably, based on her history, she was actively drinking and jeopardizing her safety through continued association with father. And, although she was aware of the dispositional hearing, she failed to appear and the court found this failure to be willful. Thus, there was absolutely no indication that mother had stabilized in any way. Further, the social worker was concerned that mother might have been the one who bit Matthew and felt she continued to be a safety risk, even in a supervised setting.

Finally, additional information regarding Matthew indicated that the minor was so hungry when he was rescued that he drank three six-ounce bottles of formula in rapid succession. He also screamed in pain when his foster mother had to change the dressings on his burns and bite marks, and thus, in the words of the social worker, had endured "a tremendous amount of physical suffering" as the result of his abuse and abandonment. Moreover, the infant was irritable, fussy, and unhappy when detained, but had since stabilized in foster care. Under the circumstances, it was undeniably reasonable for the court to require some progress from mother on her many issues before considering reintroducing her into the life of her obviously traumatized son. Thus, the evidence strongly supports the conclusion that the juvenile court's visitation order was crafted consistent with Matthew's physical and emotional well-being.

■ As the *T.M.* court noted, " 'the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense.' " (*T.M., supra,* 4 Cal.App.5th at p. 1220; see also *In re S.H.* (2003) 111 Cal.App.4th 310, 317 [3 Cal.Rptr.3d 465] ["[i]t is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances"].) However, the parents' interests are protected under the dependency framework as "there will be subsequent hearings, and therefore ample opportunity for the juvenile court to revisit the appropriateness of visitation in light of new circumstances." (*T.M., supra,* 4 Cal.App.5th at p. 1220.) This is exactly what happened here, with the juvenile court reinstating mother's visitation approximately three months after it had been suspended upon a showing that she was progressing in residential treatment. We see no error.

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The juvenile court's detention and dispositional orders temporarily denying mother visitation with Matthew are affirmed. Mother's writ petition is denied on the merits. (See § 366.26, subd. (*l*)(1)(C), (4)(B).) The finality of this opinion shall be governed by rule 8.264(b). (See also rules 8.452(i), 8.470, 8.490(b)(2)(A).) The previously imposed stay issued by this court is hereby dissolved.

Ruvolo, P. J., and Streeter, J., concurred.

---

*See footnote, *ante*, page 1090.