Filed 12/29/20  In re Ma.P. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Ma.P., a Person Coming Under the Juvenile Court Laws | |
| _____ | A159798 |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, | (Alameda County Super. Ct. No. JD03067501) |
|     Plaintiff and Respondent, | |
| v. | |
| C.H., | |
|     Defendant and Appellant. | |

In this juvenile dependency proceeding, C.H. (Father) appeals an order denying his request for telephone contact with his minor son, Ma.P.  He contends the order is not supported by sufficient evidence of a threat to the child's physical safety or emotional wellbeing.  We will affirm.

1

## I. FACTS AND PROCEDURAL HISTORY

In consolidated appeal numbers A157057 and A157984, we affirmed the juvenile court's orders of February 13, February 28, March 14, March 28 and July 19, 2019, in which the court temporarily denied Father's visitation with five minor children—I.P., Ma.P., S.P. (also known as A.P.), Me.P., and J.P. We concluded there was sufficient evidence that even therapeutic visits would threaten the children's emotional wellbeing. In this appeal, Father challenges the juvenile court's subsequent order of February 13, 2020, which denied Father telephone contact with Ma.P.[1]

### A. Factual Background of Prior Appeals

The Alameda County Social Services Agency (Agency) brought the children—one to six years old at the time—into protective custody in January 2019. A January 2019 dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b)[2] alleged that Mother and Father had a history of domestic violence, Father perpetrated domestic violence against the children (including one incident that may have caused physical injury), and Mother failed to protect the children. The court ordered that the children be detained. In February 2019, Father obtained presumed father status as to the children except for I.P.

In its addendum report of February 28, 2019, the Agency advised that Father acknowledged his rage and need for help, claimed his anger was

---

[1] Father has asked us to take judicial notice of the appellate record in consolidated appeal numbers A157057 and A157984. We grant the request and, in this opinion, summarize the facts that we included in our opinion in those appeals. We also note that Father is identified in the caption of this appeal as C.H. but was identified in the caption of the consolidated appeals as C.F., apparently due to an inconsistency in abbreviating Father's name.

[2] Except where otherwise indicated, all statutory references are to the Welfare and Institutions Code.

2

related to childhood trauma, and admitted violating a protective order. Roberto Macias-Sanchez, the individual therapist for Ma.P., noted several reports of past abuse and reported that Ma.P. had classroom difficulties due to being afraid of making mistakes and getting in trouble with Father. "SPARKS" program director, Rose Messina, recommended that visitation between the children and Father be postponed until Father had fully engaged in appropriate intervention, given the risk that the children could experience emotional dysregulation if reintroduced too soon to an adult who caused them harm.

At the jurisdictional and dispositional hearing on February 28, 2019, the court adjudged the children dependents of the court and found true the allegations of the petition as amended. The court ordered that the Agency provide family reunification services to Mother and Father. The court further ordered that visitation with Father continue to be temporarily suspended, deferring the visitation issue to the next interim review hearing.

The court continued the order temporarily suspending Father's visitation at the review hearings on March 14, March 28, May 15, June 7, and July 19, 2019. For the May 15 hearing, it was reported that Father had just started to engage with services and that therapist Macias-Sanchez and others on the therapeutic team believed the children could suffer further emotional harm if visits occurred before Father had engaged in services and received treatment. For the July 2019 hearing, therapist Reynoso reported that the family sessions had not delved deeply enough for the children's healing and sense of safety, and Macias-Sanchez warned that asking children to override their psychological defenses to satisfy Father's need to see them would be detrimental to their long-term adjustment. At the July 2019 hearing, after the children's counsel asked that visitation be deferred pending

3

clarification from Macias-Sanchez and recounted that the children had "suffered great damage at the hands of Father," Father let out an audible groan which, along with similar behavior at the hearing, led the court to question his therapeutic progress. The court also noted evidence that the mere mention of Father's name during therapy triggered the girls such that they looked down or withdrew, causing concern about even therapeutic visits. We affirmed the court's rulings.

B.  Factual Background Since Father's Prior Appeals

1.  October 2019 Review Hearing

On October 1, 2019, the court continued family reunification services to Father until the 12-month permanency hearing date and granted the Agency discretion to arrange therapeutic visits between Father and the children with input from the child's therapist and notice to the child's attorney.

2.  Twelve-Month Permanency Report and Hearing

For the 12-month permanency hearing (§ 366.21, subd. (f)), the Agency recommended that Ma.P. and his brothers remain out of home, that his sisters have a two-week trial visit with Mother in anticipation of their return to her with family maintenance services, and that Father's reunification services be terminated.

According to the Agency's status review report, Father was living with his grandmother, was employed, had engaged in most of his case plan services, and had identified ways to help the children through their trauma and provide them with love, protection and safety. His case plan objectives included being able to identify the children's emotional needs, completing a parenting class, conducting self-research, identifying triggers and ways to deal with frustration appropriately, and participating in a domestic violence program and therapeutic counseling sessions.

4

Father had attended domestic violence sessions and recognized his anger stemmed from witnessing domestic violence while growing up. He completed parenting education, discussed the importance of managing his emotions and validating his children's emotions, and had been working on identifying what the children needed from him.

Father's attendance at individual therapy sessions became less consistent in late September 2019. On October 31, 2019, he paused therapy for November due to stressors such as transportation issues and needing to relocate. He participated in therapy sessions by phone in December 2019 and was supposed to return to in-person sessions on January 11, 2020 but overslept. He was doing well in therapy, but his therapist was worried that he "cannot really focus, get[s] really nervous and makes decisions that come back to hurt him."

Father also received therapeutic support from Macias, who noted Father's significant progress and engagement in processing his trauma and understanding the trauma caused to the children. Father had checked in with Macias every week since mid-November 2019. With Macias's help, Father wrote the children approximately five letters.

Father's letters were read to Ma.P. and I.P. by their therapist, Ms. Ponthier. Ma.P. showed distress when speaking about Father and walked around the room and was disengaged, but he said he wanted to see Father. Ma.P. also expressed to the child welfare worker that he wanted to hear from Father and talk with him by phone. However, Ma.P. brought up memories of Father "fight[ing]" Mother, Ma.P. was having challenges at school, and he was receiving weekly individual therapy to process unresolved trauma related to his parents' domestic violence and stressors related to being separated from his parents and other siblings.

5

As to Ma.P.'s siblings, Ponthier reported that I.P. became anxious and dysregulated when he spoke about Father, paced up and down trying to make sense of Father's letters, and needed more time to process his feelings in order to be ready to speak to Father. In December 2019, I.P. informed the child welfare worker that he would like to continue hearing from Father and wanted to return to Mother's care.

The therapist for Me.P. and A.P. stated they became dysregulated when talking about Father and A.P. still brought up events that occurred in the home. The girls' caregiver reported that when the therapist tried to introduce a letter from Father, A.P. "shutdown and left the room" and stated "I don't like him, he's mean," and Me.P. ran into the caregiver's arms. In December 2019, the child welfare worker read Father's letter to Me.P. and A.P., and the girls said they would like to hear more from him. The Children's Hospital clinicians—Ponthier, Reynoso, and Macias— recommended the children start by listening to voice recordings of Father and transition to family therapy.

At a Child Family Team meeting on January 17, 2020, Father was able to give an example of handling frustration with a co-worker by taking a deep breath, walking away, and telling himself it was not worth arguing or hitting the coworker. He agreed to start with phone calls with the children and move to supervised visits, and he wanted to engage in more domestic violence classes and attend a fatherhood group.

Nonetheless, the Agency remained concerned about Father's ability to provide safety to the children and to address conflict without intimidating them with his body language. The Agency was also concerned about his relationship with the children, his small support network, the children's reactions to his letters, and his reduced consistency in therapy.

6

At the 12-month permanency hearing on February 13, 2020, Father's counsel objected to the Agency's recommendation to terminate Father's reunification services. The court set a contested hearing and gave the Agency discretion to initiate a trial visit between Mother and Ma.P.'s sisters pending the contested hearing.

During the hearing, the children's attorney noted that she had raised the topic of Father's visitation with each of the children. Counsel noted that Me.P. and A.P. "reacted very strongly and very adamantly" that they did not want to see Father, and the girls had said "that he was a bad daddy and hurt them." Counsel did not advocate for any visitation or contact between them and Father, and there remained a criminal protective order prohibiting Father's contact with the youngest sibling. Although Ma.P. said he would not mind talking to Father on the telephone to see if Father was okay, counsel opposed all contact between Father and the children until the contested hearing because Ma.P.'s reaction to Father's letter was "not necessarily super positive" and Father's participation in therapy had been less consistent recently.

Father's counsel asked the court to give the Agency discretion to allow telephone contact between Father and Ma.P. The court denied Father's request, explaining its decision as follows: "We're not going to bifurcate the children out, where one has contact by telephone and the remainder is—quite frankly, the girls want no contact. [¶] [One of the] children, when even learning that a letter was sent by [Father] to a visitation type of meeting, was withdrawn and frightened, and then the other articulated that he's mean. And I don't want the children traumatized. [¶] There is already a situation we see coming down the pike because the Court is affording discretion to the agency to start the trial visit of [A.P.] and [Me.P.] with [Mother] forthwith.

7

And so the boys are going to be a little bit on the outside, and the children will have feelings about that, and I don't want to add onto anyone's plate the dynamic of somebody's talking to [Father] over the phone. [¶] I don't think that's healthy for the kids . . . based on the information I have." This appeal followed.

## II. DISCUSSION

Father incorporates his argument from his earlier appeals. (Cal. Rules of Court, rule 8.200(a)(5).) He contends section 362.1, subdivision (a)(1) required the court to allow him to visit his children, and the evidence at the time of the February 13, 2020 hearing did not show that telephone visits between him and Ma.P. were a threat to Ma.P.'s wellbeing.

Under section 362.1, subdivision (a), an order placing a child in foster care and ordering reunification services "shall provide as follows: [¶] (1) [¶] (A) Subject to subparagraph (B), for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child. [¶] (B) No visitation order shall jeopardize the safety of the child." Thus, visitation is required unless it would jeopardize the child's "safety," while the frequency of the visitation turns on the child's "well-being." (§ 362.1, subd. (a).)

Given the statutory language, courts are split on whether section 361.2 requires visitation unless there is evidence of a threat to the minor's *physical* safety (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1491–1492) or whether visitation may also be denied based on a threat to the minor's *emotional* well-being (*In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1101–1103; *In re T.M.* (2016) 4 Cal.App.5th 1214, 1219–1220; *In re Mark L.* (2001) 94 Cal.App.4th 573, 581, disapproved on another ground in *Conservatorship v. O.B.* (2020) 9 Cal.5th 989, 1010 fn. 7.) We agree with the majority of courts holding that

8

visitation may be denied (at least temporarily, as in this case) if the visits (in-person or telephonic) threaten the child's emotional well-being. Because the juvenile court is explicitly authorized by statute to reduce the frequency of visits due to concern for the child's well-being, it is reasonable to conclude that the frequency of visits might be reduced temporarily to zero rather than expose the child to further emotional trauma, particularly since traumatic visits would do nothing to further reunification.

Here, substantial evidence supports a finding that the children, including Ma.P., would be at risk of detriment to their emotional well-being if Father was granted telephone contact with Ma.P. As set forth in greater detail in our opinion in appeal numbers A157057 and A157984, Father had a history of domestic violence and physical aggression towards Mother and the children, including incidents that caused injury, and Father acknowledged his rage and admittedly mistreated the children and violated a protective order. As of the time of the July 2019 hearing, there was substantial evidence that the children would be harmed emotionally if exposed to contact with Father, even in the context of therapeutic visits.

Although some progress had been made by the time of the February 2020 hearing, Ma.P's therapist reported that Ma.P. showed distress when speaking about Father, he had brought up memories of Father fighting with Mother, he was having challenges at school, and he was receiving weekly individual therapy to process unresolved trauma. Although Ma.P. said he wanted to talk with Father by phone, his therapist reported that he became dysregulated and started wandering around the room. Furthermore, Father had been inconsistent in participating in therapeutic services and, as recently as the previous month, his therapist reported he was worried that Father

9

"cannot really focus, get[s] really nervous and makes decisions that come back to hurt him."

Moreover, while Ma.P. stated he would not mind talking to Father, his siblings were adamant that they did not want visitation with Father. The children were also about to undergo a potentially traumatic transition, with two of Ma.P.'s siblings returning to Mother's home while Ma.P. and his brothers remained in foster care. Ma.P. yearned to return home to his Mother's care too, and his counsel reported that he wanted the court to know "he would give you a million dollars if he could live with his mom." Mother recognized that the transition would be difficult and was concerned how it would "feel for her sons."

In light of the children's history of trauma, Ma.P.'s continuing dysregulation when talking about Father, the impending separation of Ma.P. from his siblings and inability to return home to Mother, and his siblings' adverse reaction to the idea of Father's visits, substantial evidence supported the conclusion that, as of the February 13, 2020 hearing, it would be detrimental to the emotional well-being of Ma.P., if not of all the children, if Father was allowed contact with Ma.P. by telephone. Given this substantial evidence, Father fails to demonstrate an abuse of discretion.

## III. DISPOSITION

The order is affirmed.

10

 

_____

NEEDHAM, Acting P.J.

We concur.

_____

BURNS, J.

_____

REARDON, J. *

*In re Ma P.* / A159798

---

    \* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.