Filed 12/21/22  In re Bran. S. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re BRAN. S. et al., <br><br> Persons Coming Under the Juvenile Court Law. | B313381 <br><br> (Los Angeles County Super. Ct. No. 20CCJP03746) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> BRANDON S., <br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Affirmed in part, reversed in part.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Nonoffending father Brandon S. (Father) appeals from the juvenile court's May 11, 2021 dispositional orders requiring Father to participate in 10 random drug tests and that Father's visits with his children, Bran. S. and B.S., be monitored.[1]  Mother O.B. (Mother) is not a party to this appeal.

———————————

[1] In Father's opening brief, he also argued that the juvenile court erred in finding the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply without sufficient initial and further inquiry.  Thereafter, on August 22, 2022, the juvenile court issued two minute orders returning Bran. and B.S. to the home of Mother.  The Los Angeles County Department of Children and Family Services (DCFS) requests that we take judicial notice of these minute orders pursuant to, inter alia, Evidence Code section 452.  Father does not oppose the request for judicial notice, and we grant it.  The parties agree, and we concur, that because Bran. and B.S. have been returned to Mother, whether DCFS and the juvenile court fulfilled their duties under ICWA is moot.  (See *In re A.T.* (2021) 63 Cal.App.5th 267, 274 [ICWA does not apply where child is placed with a parent]; *In re Austin J.* (2020) 47 Cal.App.5th 870, 881, fn. 5 [when court terminates foster care placement and returns child to parent's custody, the "question whether to reverse the prior order based on noncompliance with ICWA is . . . moot"]; *In re Dani R.* (2001) 89 Cal.App.4th 402, 404 [" 'action that originally

DCFS does not take a position as to the juvenile court's order requiring random drug tests, noting it recommended testing only upon suspicion. DCFS argues that as to the juvenile court's order requiring monitored visitation, the juvenile court did not err.

The juvenile court has broad discretion to determine what would best serve and protect a child's best interest and to fashion a dispositional order in accordance with this discretion. We will not reverse such a determination absent a clear abuse of discretion. This deferential standard of review is dispositive as to the juvenile court's order requiring monitored visitation. At the inception of this matter, Father's children were four and two years old. Among other issues, Father had not seen them for over two years and was a stranger to them. Accordingly, we affirm the juvenile court's visitation orders.

However, there was no evidence Father abused marijuana, or would use marijuana while his children were in his care, justifying the requirement that Father participate in random drug testing. We therefore reverse the juvenile court's order requiring 10 random drug tests.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Family**

On June 26, 2020, Mother was arrested following a domestic violence incident with her male companion, Jason H. At the time, Mother lived with Jason and her five children: 12-year-old son Eddie C., eight-year-old son J.W., four-year-old daughter

---

was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events' "].)

3

Bran. S.; two-year-old son B.S., and eight-month-old son O.B. Father did not live with the family, and only his children, Bran. and B.S., are subjects of this appeal. We focus our factual summary to the challenges Father raises on appeal.

DCFS detained the children and placed them with maternal aunt, D.M.

### B. Pre-petition Interviews with Father

During interviews with a DCFS social worker, Father indicated he had had no involvement or contact with his children for over two years. He explained that Mother refused to allow him access to the children, and he eventually lost contact with them. He attempted to track Mother by "filing child support on himself," but thereafter made no other efforts to find his children.

Father stated that he and Mother engaged in domestic violence approximately three years ago, when they were in a relationship. He claimed that Mother drank excessively and became aggressive, that Mother used pepper spray on him, that she tried to hit him with her car, and that once, approximately three years ago, she left the children unattended on his doorstep. Despite this concerning behavior, Father took no steps such as contacting Mother's relatives, DCFS, or law enforcement to locate or otherwise protect the children after Mother and Father separated.

A DCFS social worker observed that Father lived in a studio apartment, which was "fairly clean." The social worker "did not observe any drug paraphernalia." Father said he smoked marijuana a few times a week and agreed to submit to an on-demand drug test. According to the social worker, a collateral contact (unidentified in DCFS's reports) indicated Father used illegal drugs. Other than this single, uncorroborated notation,

4

the record does not disclose evidence that Father used illegal substances.  Father denied any illegal drug use, and DCFS's investigation indicated Father did not have any criminal history.  Father acknowledged he had been diagnosed with depression a few years ago and was not receiving any services or taking the medication that had been prescribed to him.  Father also said that he was "more than willing" to be assessed for placement.

DCFS concluded placement of Bran. and B.S. with Father would be detrimental to the children as Father "has not demonstrated appropriate parental protectiveness nor judgment in taking meaningful consistent action to locate his two very young children, when Father was on notice that Mother engaged in excessive alcohol drinking[ and] demonstrated violent behaviors."  DCFS recommended monitored visitation and that Father "submit to random [drug] tests . . . as marijuana use by a single parent of children of tender years, without a support system, is not inherently safe."

On July 16, 2020, Father tested positive for marijuana metabolites at 202 ng/ml.

## C. The Petition and the Detention Hearing

On July 14, 2020, DCFS filed a petition pursuant to Welfare and Institutions Code[2] section 300, subdivisions (a) and (b)(1), alleging Mother's five children were at substantial risk of harm due to Mother's domestic violence with Jason.  That same day, Mother pled nolo contendere to a single count of misdemeanor willful infliction of injury on a spouse, cohabitant, or person with whom the perpetrator had a relationship under

_____

[2] Further unspecified statutory references are to the Welfare and Institutions Code unless otherwise designated.

5

Penal Code section 273.5. The criminal court sentenced Mother to probation for a period of three years, with 38 days in Los Angeles County Jail, and ordered her to complete a 52-week domestic violence program.

At the July 17, 2020 detention hearing, minors' counsel joined DCFS's written recommendation that Father's visitation with Bran. and B.S. be monitored, arguing "[F]ather was aware of Mother's drunken behavior . . . and didn't really make a concerted effort to rescue his children until now." DCFS also requested "random testing" of Father. Father argued that the children be released to him or that he be granted unmonitored visitation with the children.

The juvenile court found Father to be Bran. and B.S.'s presumed Father, detained the children from Mother and Father, and granted temporary custody to DCFS. It also granted monitored visitation to Mother and Father, with discretion for DCFS to liberalize the visits. Following a request from counsel for the father of one of Mother's other children, the juvenile court also ordered DCFS to create a written visitation schedule. As to drug testing, the juvenile court observed, "There are concerns, I suppose, regarding marijuana with [Father]. So I will order that [DCFS] contact the parents. Predispo weekly testing, I won't order it outright, even given what the pled allegations are. However, I think it would be to the parents' benefits if they are seeking release." The record does not reflect that DCFS pursued further drug tests from Father.

## D.  Jurisdiction and Disposition

On August 28, 2020, DCFS filed a jurisdiction and disposition report. It disclosed that on August 25, 2020, a DCFS social worker interviewed Father telephonically. DCFS reported,

"Father sounded to be coherent and he denied being under the influence of any illegal substances. Father would not deviate from topics during the conversation. Father was able to effectively communicate and answer questions accordingly. Father was oriented to time, person, place, and situation. Father also did not sound to be hallucinating or delusional. Father stated he had just woken up. [¶] It should be noted that [Father] stated he felt competent and confident in discussing the petition and was observed to have clear, logical and coherent speech."

Father advised DCFS that he wanted his children with him and would enroll in and complete all court-ordered programs. He also stated that Mother has a pattern of falsely accusing the fathers of her children of drug abuse. DCFS recommended Father participate in parenting classes, that he "submit to on-demand testing upon suspicion," and that his visits with the children be monitored by a DCFS approved monitor in a DCFS approved setting. DCFS also reported Bran. and B.S. did not appear to have any developmental or intellectual disabilities.

DCFS arranged for Father to have monitored visitation with Bran. and B.S. on September 9, 2020. A DCFS social worker arrived at maternal aunt's door to pick up the children for the visit. One of Mother's other children answered the door and the social worker asked that maternal aunt and Bran. and B.S. come to the door. No one returned, and the social worker attempted for an hour to reach Mother or maternal aunt by telephone or to have someone answer the door. DCFS recommended the juvenile court admonish Mother and maternal aunt.

Between September 10, 2020 and May 11, 2021, the juvenile court continued the combined jurisdiction and

dispositional hearing six times. At the originally scheduled hearing on September 10, 2020, Father's counsel argued Father had not been permitted to see his children. The juvenile court admonished Mother and ordered DCFS to prepare a written visitation schedule for Father and to facilitate visits between Father and the children.

On October 8, 2020, DCFS attempted to contact Father by telephone, but the phone number was not in service. DCFS also mailed a letter to Father. On October 27, 2020, DCFS spoke with Father by telephone. Father observed he had not had any visits with the children.

At a scheduled hearing on November 5, 2020, Father's counsel again reported that Father had not been able to visit with his children and requested DCFS provide a visitation schedule for Father and assess Father's home for placement.

In a December 17, 2020 last minute information (LMI), DCFS noted, without describing the impetus for the change or whether more children were affected, that B.S. resided with a new caregiver. DCFS had not yet finalized identifying a monitor for Father's visits.

At a scheduled hearing on January 6, 2021, Father's counsel again requested a written visitation schedule, arguing that although there had been a change in the caregiver, Father still had not been able to visit with his children. Father's counsel also requested an assessment of Father's home for release of the children to him. DCFS responded that it had difficulty in reaching Father, but that a visit had been scheduled for the upcoming weekend. Father's counsel responded that she was not aware that any visit had been scheduled. The juvenile court observed it had made prior orders for visitation and assessment

and ordered DCFS to file an LMI concerning its progress in addressing these orders.

On January 11 and 13, 2021, DCFS attempted to schedule an assessment of Father's home. However, in part due to Father not returning telephone calls for several days, which he stated was a result of his work schedule, DCFS did not schedule or conduct the assessment.

On February 4, 2021, a DCFS social worker conducted an assessment of Father's home. The social worker noted the smell of marijuana was present, and "Father reported that he smoke [*sic*] marijuana." The social worker also observed a bottle of liquor on top of the refrigerator, and Father stated that he drank occasionally. On February 18, 2021, Father reported he was out of state and that he wanted his visits with the children to begin in March. DCFS recommended monitored visitation for Father and that he submit to on-demand drug tests upon suspicion.

On April 6, 2021, a social worker telephoned Father, but he did not answer. On April 23, 2021, DCFS reported that "Father has not made himself available and has not provided proof of enrollment in any services." The visitation schedule for Father was not finalized.

On May 11, 2021, the juvenile court held the combined jurisdiction and dispositional hearing. It sustained the section 300 petition. Father's counsel informed the juvenile court that she never received a written visitation schedule and that Father had called DCFS, but "the phones were off." Counsel argued Father should receive unmonitored overnights with the children but acknowledged "he's not asking for a home-of-parent today because he does not want to put these kids in a position where they're being returned to a stranger." Father advised the

juvenile court that he left for Ohio on Valentine's Day and "got back around March. And I texted the social worker as soon as I got back that I was back. And I called and it went to voicemail. I tried to call the supervisor and left messages. No one has called me back or anything."

The juvenile court ordered monitored visitation and scheduled a progress hearing relating to the issue the following month. The court also stated that because of the age of Father's children, it wanted Father to agree to random marijuana tests with decreasing levels to ensure his use was not at such a level that it would cause him to be impaired in caring for his young children. Father's counsel argued there was no evidence that he ever smoked marijuana around the children. Thus, Father's counsel argued, the juvenile court should order random tests upon suspicion. Counsel also argued in favor of unmonitored visitation, noting that identifying a monitor would be another barrier to visitation. The court responded, "[t]hese children don't know their father. That would be basically having children with, unfortunately, a stranger. I have to take some interim baby steps. Additionally, I don't know if he smokes pot around the kids or not." The court removed the children from Father and Mother, and ordered Father to participate in 10 random or on-demand consecutive drug tests and parenting classes. The juvenile court explained to Father, "you can smoke pot, or you can be a dad. But it's really hard to do both." Further, the court wanted the drug tests to show Father's use was "decreasing to almost non-existent." The juvenile court also ordered that Father have three hours of monitored visitation with the children three times a week (with DCFS having discretion to liberalize), that DCFS provide a written visitation schedule, and that neither

10

parent could visit the children under the influence of alcohol or drugs, including marijuana.

The appellate record includes, and Father refers to, a post-dispositional LMI dated June 9, 2021. DCFS reported that on May 14, 2021, a DCFS social worker ensured Father had the correct phone number to reach her. On May 21, 2021, DCFS confirmed with Father that Saturday visits worked for him and scheduled a visit for Father and his children for May 29, 2021, from 11:00 a.m. to 1:00 p.m. On May 28, 2021, a social worker telephoned Father at two different telephone numbers. Father did not answer. Father was scheduled to take a drug test that day, but did not appear for the drug test. On June 4, 2021, Father informed the social worker that he had a lot going on in his life and failed to check for the scheduled drug testing and forgot about the visit with his children.

Father timely filed a notice of appeal.

## DISCUSSION

### A. Legal Principles and Standard of Review

"The juvenile court has 'wide latitude' in formulating reasonable disposition orders for the care, custody, support, and well-being of juvenile dependents. [Citations.] Section 362, subdivision (d) provides: 'The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings . . . as the court deems necessary and proper to carry out this section . . . .' [Citation.]" (*In re K.T.* (2020) 49 Cal.App.5th 20, 24.)

"Section 362 also authorizes the juvenile court to require a nonoffending parent to comply with orders pertaining to a child once the court has accepted jurisdiction. [Citation.] The court's broad discretion to determine what would best serve and protect

11

the child's interest and to fashion a dispositional order in accord with this discretion, permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings. [Citation.]" (*In re K.T.*, *supra*, 49 Cal.App.5th at p. 25.)

We review disposition orders, including orders requiring drug testing and setting visitation terms, for an abuse of discretion. We will not disturb such orders unless the juvenile court made an arbitrary, capricious, or patently absurd determination. (*In Brittany C.* (2011) 191 Cal.App.4th 1343, 1356 [review of juvenile court's visitation order]; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [review of juvenile court's drug testing order].) We review the factual findings upon which dispositional orders are based for substantial evidence. (*In re K.T.*, *supra*, 49 Cal.App.5th at p. 25.)

## B.     The Random Drug Testing Order

Father first argues the juvenile court erred in requiring him to participate in 10 random drug tests. We agree.

"There must be an evidentiary basis for a court to order particular services as the juvenile court's discretion in fashioning reunification orders is not unfettered." (Seiser & Kumli, 1 Cal. Juvenile Courts Practice & Procedure (2022) § 2.129.) Thus, a reunification or service plan cannot require a parent to participate in services if there is no evidence that it is necessary to protect the child. (See *In re K.T.*, *supra*, 49 Cal.App.5th at p. 25 [juvenile court order requiring the father to participate in a parenting course was an abuse of discretion because substantial evidence did not support a finding that it was needed to protect his daughter]; *In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180

12

[reversing order requiring nonoffending mother to attend a parenting class where there was no evidence offered to show that the class would have eliminated the conditions that gave rise to the dependency case]; *In re Sergio C.* (1999) 70 Cal.App.4th 957, 960 [reversing juvenile court's "invasive order" that the father submit to random drug tests where only evidence of drug use was "the unsworn and uncorroborated allegation of an admitted drug addict].)

The evidence in the record does not demonstrate Father abused marijuana, or that he had used it or would use it in the future while around his children. On July 10, 2020, Father was forthcoming that he smoked marijuana "a few times during the week," and on July 16, 2020, he tested positive for marijuana. A DCFS social worker also reported that seven months later, on February 4, 2021, she noticed the scent of marijuana in Father's home, although the record is unclear whether he smoked before her visit. DCFS never reported that it suspected Father of being under the influence when it spoke to him on any occasion. Rather, DCFS reported Father sounded coherent, "was able to effectively communicate and answer questions," and had "clear, logical and coherent speech." Further, there is no evidence that the level of marijuana metabolites present in Father's drug test indicated daily or excessive use.

Thus, evidence establishes only that Father occasionally used marijuana, a legal substance, and nothing more. It also bears mentioning that the evidence in the record of Father's marijuana use occurred during a period when he did not have contact with his children. Father does not object to the court's order that he cannot visit the children under the influence of alcohol or drugs, including marijuana; he also agreed with a

13

request from DCFS to submit to on-demand drug testing upon suspicion.  Because there is no evidence that the juvenile court's order requiring Father to take 10 drug tests was necessary to protect his children or related to the conditions that gave rise to the dependency matter, we conclude this order was an abuse of discretion.

## C.    The Order Requiring Monitored Visitation

Father next argues that the juvenile court erred in denying his request for unmonitored visitation because there was no evidence that such visitation would threaten the children's physical safety or emotional well-being.  As Father acknowledges, however, the standard requiring a showing of a threat to a child's safety or emotional well-being applies when the juvenile court denies parental visitation entirely.  (See *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1102 ["a juvenile court may suspend or deny visitation pursuant to [§] 362.1, [subd.] (a), if such visitation would be inconsistent with the physical or emotional well-being of the child"].)  Father has not demonstrated that requiring his visits be monitored poses such an obstacle to visitation that he is unable to see his children.  Accordingly, the juvenile court did not need to first find the children's safety or emotional well-being were at risk before ordering monitored visitation.  Rather, the juvenile court had the discretion to craft visitation orders that balanced Father's interests in visitation with the best interests of his children.  (See *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)

Here, the juvenile court's orders requiring monitored visitation with Bran. and B.S. have a rational basis.  As Father acknowledges, he is a stranger to his young children.  He has been absent for nearly the entirety of B.S.'s life and for over half

of then-four-year-old Bran.'s life. Father argues children in dependency matters are placed frequently with people they do not know, such as foster parents, when they are taken into temporary custody. Therefore, "it should[ not] matter that the children did[ not] know their father." However, children are placed with foster parents out of necessity,[3] and it is reasonable that the juvenile court limit instances in which it places dependent children alone with persons they do not know.

Father next argues Mother, maternal aunt, and DCFS bear responsibility for his children not knowing him. Father's argument has some merit. But Father also bears responsibility: he made minimal efforts to be part of his children's lives for at least two years prior to the dependency proceedings, did not promptly respond to communications from DCFS, and, as he acknowledges, "didn't attend every visit which was scheduled." Irrespective of who was to blame, it was not an abuse of discretion to order visitation initially be monitored to help reassure the children when spending time with a parent who is a stranger to them. In addition to the presence of a monitor reassuring the children, there was also evidence that a monitor was appropriate given Father's actions prior to visitation including failing to take steps in the past to protect the children before the dependency matter began. Accordingly, and keeping in mind our deferential standard of review, we conclude the juvenile court's orders requiring monitored visitation were not an abuse of discretion.

---

[3] Dependency statutes favor placement with relatives or nonextended family members, who are less likely to be completely unknown to the children. (See §§ 309, 361.2.)

15

## DISPOSITION

The juvenile court's order requiring Father to participate in 10 random or on-demand drug tests is reversed. The juvenile court's dispositional orders relating to Bran. and B.S. are affirmed in all other respects.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

CHANEY, J.

BENDIX, Acting P. J.

16