Filed 1/13/22  In re D.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re D.M. et al., Persons Coming Under the Juvenile Court Law. | |
| | D079376 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. Nos. J520686A-B) |
| Plaintiff and Respondent, | |
| v. | |
| D.M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

D.M. (Father) appeals jurisdictional and dispositional orders declaring his seven-year-old son, R.M., and 11-year-old son, D.M., juvenile dependents and removing the children from his custody. The San Diego County Health and Human Services Agency (Agency) initiated the juvenile dependency proceedings after receiving a referral that Father had physically abused R.M.

On appeal, Father challenges the sufficiency of the evidence to support the juvenile court's jurisdictional findings. He also challenges the court's refusal to lift the order precluding contact between him and his two sons. We reject Father's claims and affirm the orders.

FACTUAL AND PROCEDURAL HISTORY

1. *Initiation of Juvenile Dependency Proceedings*

Father and D.R.M. (Mother)[1] have two sons, D.M. and R.M. Father was awarded primary custody of both children after Mother attempted suicide in 2019. Pursuant to the custody arrangement, the children primarily lived with Father, and Mother was allowed regular visits.

During a scheduled visit with Mother on March 5, 2021, she discovered bruising on R.M.'s torso and observed him in pain. When she asked the children what happened, they disclosed that Father had beaten R.M. while they were in his care. D.M. explained that Father became angry with R.M. for breaking a dresser and grabbed him by the ankles, flipped him upside down, punched him, slammed him to the ground, and kicked him multiple times in the side. Father told D.M. after the altercation not to tell anyone what happened. When Mother texted Father to ask about R.M.'s injuries, he admitted he had spanked R.M. but blamed the rib injury on D.M.

Mother called police to report the incident. The investigating officer observed that R.M. had bruising on his right ribs and scratch on his nose.

---

[1] Mother is not a party to this appeal.

The officer also interviewed Mother and both children, and took photos of R.M.'s injuries.

Mother brought R.M. to the hospital the following day, where doctors diagnosed him with " 'injury due to physical assault, bruising, contusion of right chest wall, [and] closed fracture of one rib of right side.' " A child abuse pediatrician opined that punches and kicks to R.M.'s chest and abdomen area could have been deadly or led to internal injuries, liver laceration or bruising, bruising to the intestine and other organs, or a pulmonary hemorrhage. Further, it was unlikely the injuries were caused by another child.

D.M. was also examined by a child abuse pediatrician. Although his exam was normal, D.M. expressed during the exam that he felt unsafe with Father.

On March 8, 2021, Mother filed a restraining order to prevent Father from contacting her or the children. In addition to the most recent incident of physical abuse against R.M., Mother described two prior incidents when Father physically abused the children. Specifically, in October 2018, Mother observed Father punch D.M. in the head twice and call him a " 'momma's boy.' " The children had also disclosed to her in December 2020 that Father had punched D.M. in the head and called him " 'stupid,' " and that their stepmother picked up R.M. and threw him down. The application further indicated that Father had a history of physically and verbally abusing Mother during their prior relationship. She alleged that Father had thrown things at her, dislocated her thumb, and caused bruising all over her body. She also reported that she suffered a miscarriage in 2014 after Father repeatedly hit and kicked her. Based on the information Mother provided in the application, a temporary restraining order was granted and a hearing was set for mid-March.

3

During interviews with the social worker, R.M. and D.M. continued to claim that Father was physically abusive.  R.M. disclosed that Father and other members of Father's household, such as his stepmother and stepsiblings, physically abused him.  He stated that during the most recent incident, Father had punched him in the stomach, grabbed him by the feet, dropped him on the ground, threw him, and kicked him.  Father also threw items at D.M. during the incident and made D.M. cry.  According to R.M., his stepmother offered to give him money if he lied about his injuries, and offered to give him more money if he misbehaved at Mother's home.  R.M. also reported that Father punches D.M. in the stomach.  He indicated he felt unwanted by Father.  Since being temporarily removed from Father's care, R.M. had trouble sleeping and a decreased appetite.  According to Mother, R.M. stayed up late at night out of fear Father would come to the home and harm them.  He also took only one bite of food when Mother took him to his favorite restaurant.

D.M. confirmed that during the most recent incident, Father grabbed R.M. by the feet, shook him, dropped him, and punched and kicked him in the stomach.  Father also hit D.M. with a part of the dresser during this same incident, and threw an item at him.  Father also yelled at both children, calling them "stupid," that they were "worthless kids," and that they "didn't deserve anything[.]"  D.M. also reported that Father generally disciplines him and his brother by punching them in the head and stomach, slapping them, and throwing things at them.  He indicated that sometimes their heads hit the wall during the beatings, and that he has not been unable to breathe after being punched in the stomach.  He also claimed that his stepmother talks about his mother's drug use and suicidal history in his presence, and that Father told him he did not want R.M.  He also indicated that his

4

stepsiblings hit him and his brother and bully them. D.M. reported that he did not want to live with Father and hates seeing his brother get hit.

One of D.M. and R.M.'s stepsiblings confirmed to the social worker that Father was physically abusing D.M. and R.M. She reported that during the most recent incident, Father hit both children after blaming the boys for breaking a dresser. She stated that Father grabbed R.M. by the shirt, dragged him away, hit him on his side or back, and smacked him in the head. She also stated that Father hit D.M. with a piece of the dresser. When asked how she felt about the incident, she stated that the children "deserve it and [D.M.] cried like always." She further reported that Father hits D.M. and R.M. "a lot," and that R.M. has had "a lot" of marks on his back from the beatings. She indicated that she also hits R.M., and confirmed that the stepmother discusses Mother's history of suicide in D.M.'s presence.

During his interview with the social worker, Father denied any physical abuse toward the children. He claimed he did not notice any injuries on R.M. on March 5 when Mother picked them up. However, he admitted that earlier that day, he grabbed R.M., flipped him over, and spanked him, but insisted that this did not cause any injuries. He indicated that R.M. could have been injured while in Mother's care and suggested that Mother had fabricated the allegations of abuse. He also called R.M. and D.M. "spoiled" and claimed that R.M. had behavioral problems.

On March 11, 2021, D.M. and R.M. participated in forensic interviews. The children corroborated their initial disclosures about the most recent incident of abuse and continued to state that the abuse in Father's home was ongoing.

The Agency filed petitions on behalf of D.M. and R.M. on March 17, 2021. R.M.'s petition alleged Father had physically abused or excessively

disciplined him pursuant to Welfare and Institutions Code[2] section 300, subdivision (a), noting that R.M. had suffered injuries "including a broken rib." D.M.'s petition alleged he was an at-risk sibling due to Father's abuse of R.M. pursuant to section 300, subdivision (j). In the detention report, the Agency noted that the family had an "extensive [child welfare] history," including multiple allegations of physical abuse by Father. Although Father was counseled on the appropriate forms of discipline and child abuse laws, Father had still resorted to excessive physical discipline that caused R.M.'s injuries.

At the March 19, 2021 detention hearing, the juvenile court appointed counsel for the children and the parents, detained the children with Mother, and granted Father's request to continue the matter to March 22. At the March 22 continued detention hearing, counsel for the children requested the court order no-contact between the children and the Father pending the jurisdictional and dispositional hearing. Counsel noted D.M. was scared of Father, and Father regularly made R.M. cry. R.M. also experienced nightmares about Father's home and visualized bruising. Counsel argued that until the children progressed in therapy and seemed ready for visits with Father, contact with him would cause them emotional detriment. Father opposed the request for no-contact and asked for supervised visitation.

After hearing the parties' arguments, the juvenile court ordered to continue to detain the children with Mother and granted the no-contact order without prejudice, finding visits with Father detrimental to the children. The court expressed concerns about the potential effect a visitation order would

---

2    All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

6

have on the proceedings in family court and potentially criminal court, but indicated it would reconsider the order if presented with new information.

Pending the hearing on jurisdiction and disposition, Father continued to insist that he did not cause any of R.M.'s injuries. He denied he ever perpetrated physical abuse and suggested Mother had encouraged the children to fabricate false claims against him.

However, Mother continued to assert that Father had a history of physically abusing the children. The children had told her that Father would put them in the bathroom as punishment for not eating. Mother further reported that on one occasion, Father had the children pack their bags and told them to leave, and they were left locked outside of Father's home. She also continued to accuse Father of abusing her during their relationship. She stated he was "very aggressive" with her, and had broken holes in the walls and door hinges. During their last altercation, Father put his hands around her neck.

On March 22, 2021, the family court issued a restraining order barring Father from any contact with Mother and the children. The order was set to expire March 21, 2022, and indicated that supervised visitation or exchanges between Father and the children could occur "once authorized by juvenile court order."

On March 25, 2021, R.M. had follow up x-rays, which showed he did not sustain any rib fractures as initially suspected. Nevertheless, the child abuse pediatrician found that the punching, slamming, and kicking to R.M.'s chest area that he previously described still constituted physical abuse and plausibly caused the bruising.

At the pretrial jurisdiction and disposition hearing on April 13, 2021, the juvenile court set the matter for trial on the jurisdictional and

dispositional issues. The court also ordered for the no-contact order to remain in place, indicating that the issue would be readdressed at the pretrial status conference on June 2, 2021. During the hearing, Father's counsel indicated that Father was currently under a criminal investigation, and counsel had therefore advised Father not to speak with the Agency or anyone else regarding the allegations in the dependency proceedings.

At the June 2, 2021 pretrial status conference, the parents confirmed the matter for trial. Counsel for the children stated that both R.M. and D.M. did not want contact with Father, and counsel requested that the children should begin therapy before the no-contact order was lifted. At the close of the hearing, the juvenile court noted that Father was still covered by the restraining order prohibiting him from contact with Mother or the children, and the juvenile court's no-contact order remained in place.

In late July, R.M. started trauma therapy. R.M.'s therapist indicated he scored "high" regarding his therapeutic needs. The therapist determined that Father was not eligible to participate in conjoint therapy with R.M. because Father was the perpetrator of R.M.'s abuse. However, the therapist indicated conjoint sessions were a future possibility if Father independently participated in related services first. Around this time, R.M. continued to express he was fearful of Father and did not want any contact with him. R.M. refused to use the restroom alone, was generally afraid to be by himself, and suffered from nightmares. He told the social worker he feared Father breaking into Mother's home and kidnapping him, and Mother observed R.M. wake up crying, screaming, and shaking.

As for D.M., he also told the social worker that he did not want contact with Father. He indicated he would be more comfortable with visits if Father took parenting classes and was generally more honest. According to Mother,

D.M. had unexpectedly seen Father in public and hid from him. Mother reported that D.M. cried himself to sleep after this incident.

Meanwhile, Father completed an intake assessment for a physical abuse service on May 22, 2021. He reported he was participating in the services except for missing two classes. He recited some concepts he learned and indicated he was learning to control his temper. When discussing the incident that led to the dependency proceedings, Father admitted he had physically disciplined R.M. but continued to deny he had caused any injuries. Father also requested visits with the minors and agreed to supervised visitation.

2. *The Contested Jurisdiction and Disposition Hearing*

The juvenile court held the contested jurisdiction and disposition hearing on August 23, 2021. The court admitted into evidence the Agency's reports, as well as the curriculum vitae of the social worker assigned to the case. Counsel for the parents and the children did not proffer any affirmative evidence, and no witnesses were called.

After hearing arguments from counsel, the juvenile court struck the phrase "including a broken rib" from the children's respective petitions. The court then made true findings on the petitions by clear and convincing evidence and formally placed the children in Mother's care under a family maintenance plan, finding that placement with Father would put them at risk of physical and emotional abuse. The court found that both children had suffered physical harm by Father for years, and that physical abuse was "normalized in the home[.]" The court noted that it was "extraordinarily alarming" that the children's stepsibling was willing to confirm that the boys were being physically abused by Father, and the stepsibling's reports demonstrated that the children were subjected to a "toxic environment[.]"

9

The juvenile court also ruled that the no-contact order should remain in effect, concluding that contact with Father would be detrimental to the children. The court noted that due to the physical abuse, the children feared Father and did not want any contact. They also exhibited behavioral problems common among traumatized children. The court acknowledged Father's progress in services and indicated that the court was hopeful the family would improve after the parents and the children progressed in their individual services.

Father timely appealed.

## DISCUSSION

On appeal, Father contends the evidence before the juvenile court was insufficient to support the true findings for jurisdiction under section 300, subdivisions (a) and (j). He argues there was insufficient evidence to show that Father inflicted serious physical harm to R.M. to support a finding of jurisdiction under section 300, subdivision (a), and as such, D.M. was not an at-risk sibling under section 300, subdivision (j). He also asserts that the juvenile court erred by refusing to lift the no-contact order.

1.  *The Juvenile Court's Jurisdictional Findings Are Supported by Substantial Evidence*

"The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.) Section 300, subdivision (a) provides a basis for dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Jurisdiction under subdivision (j) requires the juvenile court to find that the child's sibling has been abused or neglected under section 300,

10

subdivisions (a), (b), (d), (e), or (i), and there is a substantial risk the child will be abused or neglected, as defined in those subdivisions. (§ 300, subd. (j); *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 566.)

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137 (*Isabella F.*).) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580.)

Based on our independent review of the record, we conclude that substantial evidence supports the juvenile court's jurisdictional findings. Both children provided consistent reports regarding the ongoing physical abuse in Father's home. They maintained that during the most recent incident, Father became angry with them after a dresser was broken, and responded by grabbing R.M. by the ankles, flipping him upside down, punching him, slamming him to the ground, and kicking him multiple times in the side. Both children also accused Father of hitting D.M. during this

11

incident. In addition to providing these consistent reports, the children's accounts of abuse were also corroborated by multiple independent sources. Police officers and doctors documented R.M.'s visible bruising from the beating, and a child abuse pediatrician opined that R.M.'s injuries aligned with his account of the incident. The children's stepsibling also reported that both boys were regularly physically abused by Father, and her description of the most recent incident matched the children's accounts. Such evidence of ongoing and intentional physical abuse was sufficient to establish jurisdiction under section 300, subdivisions (a) and (j).

Father challenges the juvenile court's jurisdictional findings by arguing that these proceedings were tainted by the allegations in the petitions that R.M. had suffered from a broken rib, which turned out to be a false diagnosis. However, during the contested hearing, the court explicitly struck the allegations from the petitions related to the broken rib, and at no point did the court rely on that diagnosis to support its jurisdictional findings. Instead, the court focused on the statements from the brother's stepsibling, which corroborated the allegations in the petition of physical abuse. The court further noted that both children were traumatized by the abuse, as both children feared Father and exhibited trauma behaviors. Thus, there is no indication in the record that the court's jurisdictional findings were reliant on R.M.'s initial false diagnosis of a fractured rib.

Father also contends that he did not cause any of R.M.'s physical injuries, and in any event, it was an isolated event. Such contentions, however, invite this court to make credibility determinations and reweigh the evidence, which we cannot do under the applicable standard of review. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 [under substantial evidence, "[w]e have no power to judge the effect or value of the evidence, to weigh the

evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence"], disapproved of on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 635-636.) In this case, the juvenile court was entitled to discount Father's attempts to downplay the severity of the abuse in favor of the children's claims that the abuse was ongoing, particularly here where the children's claims were corroborated by multiple individual sources, as previously discussed.

We are also unpersuaded by Father's attempt to characterize the abuse as a measure of appropriate discipline. "Whether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of [the] parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' " (*In re D.M.* (2015) 242 Cal.App.4th 634, 641 (*In re D.M.*).) Courts of appeal have determined there was inappropriate discipline where there was substantial evidence that the child suffered serious physical harm. (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1644 [evidence showing child suffered "bruises, red marks, welts, and broken skin" inflicted intentionally by the parent as a disciplinary measure using "a belt, cord, or ruler" was sufficient to constitute serious physical harm pursuant to section 300, subdivision (a)]; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438 [evidence that the parent struck the three-year-old child with belt on stomach and forearms as form of discipline, leaving bruises on at least one occasion, was sufficient to sustain finding under section 300, subdivision (a)].)

13

Here, there is substantial evidence to show that R.M. suffered serious physical harm within the meaning of section 300, subdivision (a). Doctors and police officers observed R.M.'s injuries from the physical abuse, and documented the bruising to his torso in their reports. One of the child abuse pediatricians who treated R.M. opined that his injuries were consistent with his statements that he was punched, slammed to the ground, and kicked to his chest area, and that this type of abuse could have been deadly. The children's stepsister also reported that R.M. sustained numerous marks on his back from the ongoing beatings Father inflicted. This record, therefore, contains substantial evidence that Father's intentional conduct caused R.M. to suffer serious physical harm that went beyond the bounds of reasonable discipline.

Father also attempts to analogize the circumstances in this case to those presented in *In re D.M.* and *Isabella F.*, in which courts concluded that the allegations of physical abuse were insufficient to sustain jurisdiction under section 300, subdivision (a). However, both cases are distinguishable. Unlike in *In re D.M.*, where the mother's physical discipline of the child was never severe enough to leave marks, this case involved multiple incidents of physical abuse in which Father's beatings left R.M. with marks or bruises. (*In re D.M.*, *supra*, 242 Cal.App.4th at p. 647.) Additionally, *Isabella F.* involved an "isolated incident" of physical harm to the minor, in contrast to this case, in which numerous sources reported that the abuse was ongoing. (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 139.)

Overall, the record contains ample evidence indicating that both children were subject to serious and ongoing physical abuse, which constitutes substantial evidence to support the court's jurisdictional findings under section 300, subdivisions (a) and (j).

2.    *The Juvenile Court's No-Contact Order Was Proper*

Father contends that a no-contact order violates his constitutional and statutory rights to visitation with his sons.  We disagree.

"Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)  "[T]he underlying purpose of dependency law is to protect the welfare and best interests of the dependent child . . . [O]nce dependency jurisdiction is acquired because of the custodial parent's conduct, the court's inquiry shifts to a focus on the child's best interests, albeit with a preference towards parental reunification." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1424-1425 (*Luke M.*).)

Under the dependency statutes, the juvenile court may prevent visitation between a parent and child based on a finding that visitation would be detrimental.  In nonreunification cases, "[t]he court may continue to permit the parent to visit the child *unless it finds that visitation would be detrimental to the child.*" (§ 361.5, subd. (f) [italics added].)  Similarly, even during the reunification period, visitation must be "consistent with the well-being of the child" (§ 362.1, subd. (a)(1)(A)), and "no visitation order shall jeopardize the safety of the child" (§ 362.1, subd. (a)(1)(B)).  Applying this statutory language, numerous courts of appeal have affirmed orders denying a parent visitation during the reunification period where visitation would be harmful to the child's well-being. (See *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1093, 1101-1102 (*Matthew C.*); *In re T.M.* (2016) 4 Cal.App.5th 1214, 1220-1221 (*In re T.M.*); *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356-1357 (*Brittany C.*); *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.)

15

Overall, "the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*In re S.H.*).)

Thus, Father's contention that the no-contact order violates his constitutional and statutory rights lacks support in the relevant legal authority. Additionally, "[t]he dependency statutes protect the parent's liberty interest in his or her child by requiring periodic review hearings conducted at six month intervals. (§ 366, subd. (a)(1).)" (*Serena M. v. Superior Court of Fresno County* (2020) 52 Cal.App.5th 659, 673-74.) In this case, Father may readdress the no-contact order with the juvenile court during subsequent hearings, such as the parties' upcoming six-month review hearing set for February 2022. Father also has the option to request to modify the no-contact order pursuant to section 388, which permits any party in the proceedings to move for the modification of a visitation order based on a change of circumstance or new evidence, and where it appears that the best interests of the child may be promoted by the proposed modification. (§ 388, subds. (a)(1) & (d).) The reunification process thus provides Father with "ample opportunity" to challenge the appropriateness of the no-contact order. (See *In re T.M.*, *supra*, 4 Cal.App.5th at p. 1220.)

As to the factual findings underpinning the juvenile court's no-contact order, the court expressly based the order on its finding that contact would be detrimental to the children. Although Father contends that this detriment finding should be reviewed de novo, this is not the correct standard of review. Instead, visitation orders are generally reviewed for abuse of discretion (see, e.g., *Brittany C.*, *supra*, 191 Cal.App.4th at p. 1356; *In re Daniel C.H.* (1990)

16

220 Cal.App.3d 814, 837-838 (*Daniel C.H.*)), and some courts have indicated that there must be substantial evidence to support the finding of detriment where visitation has been denied (see, e.g., *In re C.C.* (2009) 172 Cal.App.4th 1481, 1492; *In re Mark L.* (2001) 94 Cal.App.4th 573, 580, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005).

Under either standard—abuse of discretion or substantial evidence—we conclude the no-contact order was proper. (*In re T.M.*, *supra*, 4 Cal.App.5th at p. 1219 [recognizing the discrepancy among courts regarding the applicable standard of review for a juvenile court's detriment finding, and concluding that the order denying visitation was proper under either standard.].) Both children in this case expressed a fear of Father, and their behavior indicated they had been traumatized by the abuse. R.M. had difficulty sleeping and eating, refused to use the restroom alone, was generally afraid to be by himself, and usually slept with Mother. He also suffered from nightmares and feared Father breaking into Mother's home. D.M. exhibited similar behaviors, since he also had trouble sleeping. Additionally, when D.M. saw Father unexpectedly in public a few weeks before the contested hearing, he hid and cried himself to sleep that night. Then, by the time of the contested hearing, both children confirmed their desire to continue the no-contact order. In light of this evidence, the juvenile court reasonably concluded that contact between Father and the children would be detrimental. (See *In re T.M.*, at pp. 1220-1221 [order precluding visitation was supported by evidence in the record that minor feared father and did not want visitation]; *Brittany C.*, *supra*, 191 Cal.App.4th at pp. 1356-1357 [juvenile court appropriately suspended visitation where visits were "emotionally traumatic" to the children and the parent-child relationship had not improved over the course of the proceedings].)

Father also contends that reasonable alternatives to the order existed, such as supervised visits or visits in a therapeutic setting. However, the children expressed fear and anxiety simply at the prospect of seeing Father, and it was therefore reasonable for the juvenile court to conclude that supervised visitation was not a viable option. Additionally, R.M.'s trauma therapist concluded that Father was not eligible to participate in conjoint therapy with R.M. due to perpetrating his abuse, at least until Father had progressed in individual services first. Overall, given the children's fear of Father and evidence indicating that they were traumatized by the abuse, the court was reasonably concerned that forcing contact between Father and children could be counterproductive. Indeed, the court indicated that the no-contact order was aimed at improving the family dynamics by allowing the family members to focus on services individually before visits were authorized. (See *Brittany C.*, *supra*, 191 Cal.App.4th at p. 1357 [juvenile court's order suspending visitation and ordering individual therapy for the children was not arbitrary and appeared to be the only hope the family had of reuniting]; see also *Matthew C.*, *supra*, 9 Cal.App.5th at p. 1102 [finding it "exceedingly unlikely that such emotionally traumatic visits [between the parent and child] would do anything to advance a parent's reunification prospects, and, indeed, they might very well derail them."].)[3]

---

[3] To the extent Father contends that the juvenile court should have ordered informal supervision under section 360, subdivision (b) instead of ordering a family maintenance case, he has forfeited this contention by failing to adequately raise it below. Although Father's counsel mentioned during a pretrial hearing that Father would be seeking an order for voluntary services, the mere mention of the issue is not sufficient to preserve the issue for appeal. (See *Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1011 ["Issues presented on appeal must actually be litigated in the trial court—not simply mentioned in passing."]; *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [passing reference to an issue

18

## DISPOSITION

The orders of the juvenile court are affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

GUERRERO, J.

---

without specifically developing argument insufficient to preserve issue on appeal].)