Filed 1/18/22  Y.L. v. Superior Court CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| Y.L.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN LUIS OBISPO COUNTY,<br><br>        Respondent;<br><br>DEPARTMENT OF SOCIAL SERVICES, COUNTY OF SAN LUIS OBISPO,<br><br>        Real Party in Interest. | 2d Juv. No. B315506<br>(Super. Ct. No. 19JD-001884)<br>(San Luis Obispo County) |

Y.L., the biological mother of now 11-year-old J.L., petitions for extraordinary writ relief after the trial court, at a contested 18-month review hearing, terminated reunification services and set this dependency matter for a permanent

placement hearing.  (Welf. & Inst. Code, § 366.26.)[1]  She contends she received inadequate reunification services because the trial court gave J.L. de facto veto power over visitation and because the Department of Social Services (DSS) did not do enough to ensure that J.L. participated in visits and family therapy.  We conclude reunification services were adequate and deny the writ.

*Facts*

This is the second dependency writ proceeding involving Y.L. and her biological son J.L., born in June 2010.  In May 2016, J.L. was placed in protective custody after Y.L. was involuntarily hospitalized for psychiatric care to address her depression, post-traumatic stress disorder and substance abuse.  J.L. was eventually reunified with Y.L. and the case was closed in June 2018, shortly before J.L.'s eighth birthday.

Prior Dependency Case

In early 2019, Y.L. again experienced extreme mental illness.  She stopped seeing her therapist or taking her medication.  As Y.L.'s illness progressed, her behavior became increasingly problematic.  She made a series of bizarre 911 calls and became convinced that J.L.'s biological father was buying or selling drugs in the apartment next door and would try to kidnap J.L.[2]  As a result, Y.L. severely limited J.L.'s time outdoors,

---

[1] All statutory references are to the Welfare & Institutions Code unless otherwise stated.

[2] Y.L. also reported that her apartment and car were broken into.  These reports were later confirmed by law enforcement.  Y.L.'s landlord also acknowledged that a neighbor had been selling drugs.  It is not clear that J.L.'s biological father was ever at that location.

preventing him from going to school, playing in nearby parks or participating in soccer.

On May 8, 2019, both Y.L.'s therapist and her landlord contacted police to report her concerning behavior. When police arrived at the home, Y.L. was disoriented, staring blankly at the officers. J.L. tried to run to the police officer, but Y.L. stopped him by pointing a Febreze bottle at his face and yelling at him to sit down. She held on to J.L., preventing him from going to the officer until after she had been placed in handcuffs.

Y.L. was hospitalized for two weeks, for psychiatric care. J.L. returned to his prior foster family. After Y.L. returned from the hospital, the trial court ordered weekly supervised visits with J.L. Although he initially resisted visits, J.L. eventually cooperated and attended a few strained visits with Y.L in June and July 2019. He then refused to attend any more visits, complaining about Y.L.'s constant lying. J.L. also refused to participate in phone calls arranged by the social worker, saying he had no interest in seeing or speaking to his mother.

In August 2019, Y.L. requested family therapy with J.L., but J.L.'s therapist warned that forcing visitation or joint therapy would be detrimental to him. The trial court reduced visitation to once per month.

The trial court held a hearing on visitation and conjoint therapy in September 2019. J.L. spoke with the judge in chambers and again expressed his fear of his mother and his opposition to visits with her. J.L.'s therapist opined that he was not ready for conjoint therapy with Y.L. in light of his difficulty maintaining boundaries, his tendency to become enmeshed in Y.L.'s delusions and his fear of returning to her custody. The

3

social worker expressed her view that attempting weekly visits with Y.L. was increasing J.L.'s anxiety. The trial court denied Y.L.'s request for conjoint therapy, declined to find that visits were detrimental to J.L. and ordered once monthly visits. At the six-month review hearing in February 2020, the trial court found DSS made reasonable efforts to reunify Y.L. and J.L.

Y.L. filed a section 388 petition requesting that J.L. be mandated to participate in a therapeutic visit with her, his therapist and the social worker. In July 2020, the trial court held a joint 12-month review hearing and hearing on Y.L.'s section 388 petition. J.L. again told the judge he was afraid Y.L. would physically abuse him and prevent him from calling 911. He was also afraid she would kidnap him from his foster home in his sleep. J.L. believed that, even if his mother was doing better, she would relapse. His therapist testified that J.L. had recently experienced an increase in his PTSD symptoms. She opined that forcing him to attend visits or therapy with Y.L. would be detrimental to him. J.L.'s social worker described J.L. as "terrified" of being placed with his mother and "severely traumatized" by the previous reunification. The trial court denied Y.L.'s petition, terminated reunification services and set a section 366.26 hearing.

Prior Petition for Extraordinary Writ Relief

Y.L. filed her first petition for extraordinary writ to challenge the order terminating reunification services. We granted the writ in an unpublished opinion after concluding the services provided to Y.L. were inadequate because there was no evidence another six months of services and court ordered supervised visits would be detrimental to J.L. (*Y.L. v. Superior Court* (Nov. 16, 2020, B306926.) Our writ directed the trial court

4

to "enter a new finding that reasonable reunification services were not provided, conduct a continued 12-month review hearing at the earliest convenient time, and direct DSS to file an amended case plan to enhance [Y.L.'s] relationship with [J.L.]"

Proceedings After Remand

On remand, the trial court vacated its prior section 366.26 order, ordered psychological evaluations of Y.L. and J.L., and directed DSS to develop a new case plan designed to enhance their relationship. The parties attended a mediation and, In January 2021, the parties presented a mediated agreement to a case plan that included individual therapy for both parties, EDMR (eye movement desensitization and reprocessing) therapy for Y.L., supportive services and family therapy.

J.L.'s psychological evaluation, completed in December 2020 by Elizabeth Heidler, Ph.D., concluded, "There is little doubt that the years of instability, unpredictability, emotional and physical abuse have impacted [J.L.] and the way in which he views himself and the world around him. Unfortunately, trust, safety and security are still uncommon occurrences or perceptions for [J.L.]. He does not completely trust that the adults around him will keep him safe. [¶] [¶] . . . While there is some evidence that [J.L.] cares about his birth mother, it is the opinion of the undersigned that it would be emotionally devastating and retraumatizing if he were to return to her care or made to visit with her at the present time. In [J.L.'s] eyes, he tried reconnecting with his birth mother once with disastrous results."

Dr. Heidler further opined that contact with Y.L. "does not appear to be in [J.L.'s] best interest and could be emotionally devastating and retraumatizing for him at this

5

time. . . . Delaying a more permanent plan for [J.L.] at this point could negatively impact his mental health. Contact in the future could be entertained once [J.L.] feels safe and secure."

J.L.'s behavior and emotional state, after he learned that reunification efforts with Y.L. would continue, confirmed Dr. Heidler's predictions. He once again began experiencing nightmares, stomachaches, vomiting, difficulty sleeping, dark circles under his eyes, poor concentration and lack of focus. J.L. told his social worker he was afraid Y.L. would retaliate against him if he was returned to Y.L.'s custody because "he has told everyone the truth about her. [J.L.] reported that he feels like he would die if he were to go back to live with his mother." He became hypersensitive to noises outdoors and started sleeping with a night light due to fears of being kidnapped by Y.L. in his sleep. DSS reported that it "has made repeated attempts to discuss visitation or phone calls with [Y.L.]; however [J.L.] is rapidly decompensating, and has difficulty discussing this at this time. . . . [DSS] and the undersigned [social worker] continue to encourage [J.L.] to take baby steps toward rebuilding his relationship with his mother, and although he initially agreed to try, he has become more withdrawn and depressed."

At a hearing on February 10, 2021, the trial court reviewed the psychological evaluation and a statement from Y.L. and found there was "no question" that visitation with Y.L. would be detrimental to J.L. Based on the reports of the social workers and the psychological evaluation, the trial court found J.L. was "really not in a good place at all right now. In fact, he's in a pretty bad place . . . he's decompensating and doesn't feel safe and [is] fearful." It directed the parties to promptly select a

family therapist and scheduled a review hearing to confirm the family therapist and to evaluate the detriment finding.

On March 3, 2021, the parties filed a mediation agreement identifying their agreed-upon family therapist, giving the therapist access to their records and permitting the therapist to initiate contact with J.L. and Y.L. They also agreed that for the Easter holiday, the social worker could authorize further written contact or gifts.

J.L. attended two brief sessions with the family therapist, Gayne Pinto, in April 2021. After the second appointment, J.L.'s counsel filed a section 388 Request to Change Court Order to vacate the family therapy order on the grounds that it was detrimental to J.L. In support of the request, J.L. submitted a second psychological evaluation by Dr. Heidler, completed May 2, 2021. Like the first evaluation, it concluded, "Continuing to pursue a course of family therapy for the purpose of reunification with his birth mother, [Y.L.], would be emotionally damaging and retraumatizing for [J.L.]. Continuing to force the issue of family therapy will negate any hope of [J.L.] and [Y.L.] ever having some sort of communication or contact in the future when [J.L.] is older."

Dr. Heidler further noted that, after two meetings with the family therapist and without Y.L. being present, J.L. had nevertheless started to "revert to previous concerning behaviors such as tearfulness, ruminating thoughts, difficulty sleeping, nightmares, feeling like he needs to protect himself from being 'stolen' from his home, bedwetting, withdrawing from pleasurable activities such as going outside, aggressive acting out (hitting his previous foster brother) and displaying physical

7

manifestations of anxiety such as scratching his arms and legs and reporting stomachaches."

At the evidentiary hearing on the section 388 petition, the trial court considered the evaluation as well as testimony from Y.L. and the family therapist, Gayne Pinto. Ms. Pinto opined that the first stages of family therapy would not be "emotionally problematic" for J.L. and that he could "[v]ery, very slowly begin some kind of contact" with Y.L., supported by his personal therapist. She expressed concern J.L. would have difficulties later in life if he did not immediately begin to repair his relationship with his mother. Although Ms. Pinto had reviewed the psychological evaluations of J.L., she did not review any of DSS's reports in this matter. Her knowledge of the prior dependency case, and J.L.'s prior removal from the custody of Y.L., was limited to information she received from Y.L.

At the conclusion of the hearing, the trial court relied on the May 2, 2021 psychological evaluation to find that continuing family therapy would be emotionally damaging and re-traumatizing to J.L. It acknowledged that Ms. Pinto and social workers had tried to go very slowly with family therapy, but after just two sessions, J.L. was reverting to past behaviors and experiencing a lot of fear and stress. Although J.L. had previously expressed his strong preference to stop visits and family therapy, the trial court noted his preferences were "not even the most important reason. The most important reason is because of the actual, in fact, trauma that's being inflicted on [J.L.] during the course of the reunification therapy. [¶] So the 388 petition is granted. . . . The changed circumstances are shown by a preponderance of the evidence, and it would not be in [J.L.'s] best interest to continue therapy right now."

8

In advance of the 18-month review hearing, DSS reported that J.L. seemed to be improving. He told his social worker that he "felt the adults listened to him and that although he is less afraid he is still somewhat preoccupied with things going back to the other way" as they had in the past. He maintained that he wanted no contact with Y.L., remained fearful of her and did not believe she would or could change. J.L. stated "several times he thinks he would die if returned to" Y.L.

A September 2021 addendum report noted that J.L. had enjoyed a trip to Montana with his foster family. He reported feeling more calm and better able to sleep knowing that Y.L. could not find him there. During a subsequent visit with the social worker, J.L. stated he did not want to share information, photos or videos with Y.L. "He will continue to say no to these things until he knows he is safe and won't be forced to return to his mother's care. [J.L.] stated, 'I don't hate her, I am just afraid of her.'"

Y.L. continued to participate in therapy and to ask for more information about J.L. In communications with DSS, she expressed sadness about the situation but also anger and bitterness toward DSS. She "stated that the removal was wrong, that the Department did not handle it right, that the Department should have spoken to her therapist and the school."

At the 18-month review hearing in September 2021, J.L. testified in chambers that he remained fearful of his mother and had no positive memories from living with her. He recounted the incident in which she threatened to spray Febreze in his face if he unlocked the door for the police. He also told the trial court that Y.L. would make him chant "Kathy is the devil," referring to his foster mother. "[I]f I didn't, she would spank me harder and

9

harder and harder." J.L. also testified that Y.L. would tell him to lie to doctors about being sick to get medication and then force him to take the medication that he did not need. He kept a nightlight on in his room and slept with a wooden boomerang that he planned to use as a weapon if Y.L. tried to kidnap him.

J.L. explained that he stopped contact with Y.L. because she was "just lying constantly." He thought "nothing" good would happen if he returned to Y.L.'s custody. "It just would be horrible again. I don't want to go through that same stuff because she – I would always get hurt. Like, there was not a time where I wouldn't get hurt, either physically or emotionally. I would always get hurt."

Y.L. testified about her progress in therapy and in her A.A. groups, her support system and a number of pleasant times she and J.L. had while he was in her custody. She acknowledged that she did not regularly attend therapy between February 2019 and May 2019, when J.L. was removed from her custody, and that she had not taken her medication for "a few weeks" before the removal. Y.L. denied keeping J.L. out of school or forcing him to lie to doctors to get medication. She maintained that she did not threaten J.L. with Febreze; she was using it as a form of aromatherapy. Y.L. believed that J.L. had a distorted view of the events leading up to his removal because, "nowhere in this whole Court case has it been documented or shared that he understands what happened to me and the trauma that I was dealing with."

Y.L. testified that J.L. was removed from her custody because she "was not mentally able to care for him." She believed he stopped wanting to visit with her because "It was during summertime, so there were other activities he was involved

10

with." Y.L. believed J.L. feared she would prevent him from seeing his foster family again and also that he had fear "of untruth and lies he may have told. Fear of my disappointments in him, insecurities, doubts." J.L. was not being truthful when he said that he was stuck in his room all the time and never did anything fun with Y.L.

Y.L.'s EMDR therapist, David Lichti, testified that she had made progress in addressing her trauma. Although he had never met J.L. or reviewed any of the psychological evaluations or Department reports regarding the dependency case, Mr. Lichti opined that J.L. would benefit from addressing his relationship with Y.L. right now, rather than waiting until he felt more safe or ready.

J.L.'s therapist, Suzanne Gorder, described the fears he had expressed about Y.L. and the physical manifestations of those fears he had experienced, including body rashes, itching, lack of eye contact, regressed speech, frequent bathroom use, sleep disturbance and lack of focus in school. She described her efforts to prepare him for family therapy and opined that he was not yet *sufficiently regulated* to participate in that therapy.

Lori Spire, J.L.'s social worker, testified that she talked to J.L. about Y.L.'s sobriety and her participation in therapy. She encouraged J.L. to participate in family therapy so he could reestablish a relationship with his mother. She brought Y.L.'s gifts to him and talked to J.L. about writing letters or emails to Y.L. Ms. Spire had also witnessed J.L.'s foster mother tell him about how hard Y.L. was working on her case plan, how much Y.L. loved him and how he should try to make contact with her. Ms. Spire believed Y.L. was minimizing her behaviors and blaming DSS for improperly removing J.L. The version of events

11

Y.L. described in her testimony was different from the versions documented by prior social workers in reports to the court.

Another social worker, Barbara Duesenberg-Prior, testified that she also encouraged J.L. to meet with the family therapist. She tried to encourage J.L. to reunite with Y.L. by describing her progress and her interest in how J.L. was doing. These efforts were not successful. Ms. Duesenberg-Prior believed further delays in permanency planning would harm J.L.'s mental health and cause him to further decompensate.

Ms. Duesenberg-Prior was the social worker in J.L.'s first dependency case. She noted that, when J.L. was returned the first time, Y.L. agreed to a written safety plan. That plan ultimately failed to protect J.L. Ms. Duesenberg-Prior was concerned the same problems would occur again. She did not think there was anything more DSS could do to help J.L. reunify with Y.L.

The trial court adopted DSS's recommendation, terminating reunification services and setting the matter for a section 366.26 permanency planning hearing. After noting its earlier findings that visitation and family therapy were detrimental to J.L., the trial court concluded Y.L. and J.L. "are not in a position to be reunified at this time" and that returning J.L. to Y.L.'s custody would "create a substantial risk of detriment to [his] safety and emotional well-being." It acknowledged Y.L.'s long term sobriety and her progress in therapy but expressed concern that she focused on her own trauma when "the bigger trauma is to [J.L.] that once again was removed from his home, placed in foster placement and has had a repeat of an earlier dependency case."

The trial court found "services provided by [DSS] were very realistic given the nature of this case," and J.L.'s extreme response to both visits and family therapy. Because there is not a secure attachment between J.L. and Y.L., and because they "do not enjoy between them a feeling that the child can have trust, safety and security," the trial court found "it would be a detriment to return [J.L.] to his mother." The trial court further found that additional delay would be detrimental to J.L., as would additional reunification services. It ordered the termination of reunification services and scheduled a section 366.26 hearing for February 27, 2022.

*Discussion*

Y.L. contends she did not receive adequate reunification services because the trial court and DSS made no effort to force J.L. to participate in visitation or family therapy. As a consequence, she contends, J.L. was able to exercise de facto veto power over reunification.

We review the trial court's finding that visitation would be detrimental to J.L. and its order terminating reunification services under the substantial evidence standard. (*In re F.P.* (2021) 61 Cal.App.5th 966, 973; *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.) The finding that reasonable services have been provided must be made by clear and convincing evidence. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674.) When applying the substantial evidence standard to that finding, we keep in mind the heightened burden of proof. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.)

"Visitation is a necessary and integral component of any reunification plan." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317; see also *In re Ethan J.* (2015) 236 Cal.App.4th 654, 660

13

["Meaningful visitation is the lifeblood of the parent-child relationship"].) In recognition of that basic fact, section 362.1 requires the trial court in every dependency matter to provide for visitation between the parent and child. (§ 362.1, subd. (a)(1).) "Visitation shall be as frequent as possible, consistent with the well-being of the child." (*Id.*, subd. (a)(1)(A).)

"It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances." (*In re S.H, supra,* 111 Cal.App.4th at p. 317.) The trial court may delegate to social workers, therapists or other third parties authority to manage the time, place and manner or other details of individual visits. (*Ibid.*) It may not, however, delegate to any third party, "unlimited discretion to determine whether visitation is to occur. [Citation.] In no case may a child be allowed to control whether visitation occurs." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505.)

The dependency statutes, however, also mandate that, "No visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) Thus, if the trial court makes a finding that "visitation is inconsistent with the well-being of the child, or would be detrimental to the child, the juvenile court has the discretion to deny such contact." (*In re F.P., supra,* 61 Cal.App.5th at p. 973; see also *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1101.) A finding that visitation would be detrimental to a child will be upheld if it is supported by substantial evidence.

Here, the trial court made a finding in July 2020 that returning J.L. to mother's custody would be "'incredibly

14

detrimental'" to him.  After we issued our extraordinary writ in November 2020, the trial court vacated its previously scheduled section 366.26 hearing and ordered a psychological evaluation of J.L.  At a hearing on February 10, 2021, the trial court reviewed the evaluation and DSS's reports of J.L.'s emotional and behavioral condition.  J.L.'s therapist reported that J.L.'s PTSD symptoms had escalated.  On the basis of these reports, the trial court found that visitation with Y.L. would be detrimental to J.L.

The trial court's detriment finding is supported by substantial evidence.  J.L. was not simply being obstinate or expressing a distaste for visits with his mother.  He was experiencing physical symptoms of distress, his PTSD was escalating and both his personal therapist and Dr. Heidler, who conducted the psychological evaluation, offered their expert opinions that visitation would be detrimental to him.

Because the trial court here made a finding of detriment, Y.L.'s reliance on *In re Hunter S., supra,* 142 Cal.App.4th 1497, and *In re S.H., supra,* 111 Cal.App.4th 310, is misplaced.  In both *Hunter S.* and *S.H.,* the trial courts allowed the children at issue to refuse visits with their mothers.  Neither trial court made a finding that visitation would be detrimental to the children.

Y.L. also contends reunification services were inadequate because the trial court erroneously granted J.L.'s petition to stop family therapy.  We disagree.  First, "Unlike visitation, there is no statutory right to counseling.  Counseling is merely a service the court may order if the court thinks it would benefit the parent and the child."  (*In re F.P., supra,* 61 Cal.App.5th at p. 975.)  Second, a trial court always has

15

discretion to terminate family therapy where the therapy itself is detrimental to the child's safety or emotional well-being. (*Ibid.*)

Here, the trial court found that continuing family therapy would be detrimental to J.L. That finding was not based solely on J.L.'s refusal to participate or a de facto veto power over therapy. Dr. Heidler's second psychological evaluation, completed in May 2021, concluded that "Continuing to force the issue of family therapy will negate any hope of [J.L.] and [Y.L.] ever having some sort of communication or contact in the future." This opinion was based on a clinical interview with J.L. that included various psychological inventories and tests, as well as clinical interviews with J.L.'s foster mother, therapist and the family therapist. Those interviews disclosed that J.L. was once again experiencing extreme fear and stress, that his PTSD symptoms had escalated and that he was reverting to "previous concerning behaviors such as tearfulness, ruminating thoughts, difficulty sleeping, nightmares, . . . and displaying physical manifestations of anxiety such as scratching his arms and legs and reporting stomachaches."

Ms. Pinto, the family therapist, and Mr. Lichti, Y.L.'s trauma therapist, offered their opinions that J.L. would benefit from attending family therapy as soon as possible. However Dr. Heidler and Ms. Gorder, J.L.'s personal therapist, opined to the contrary, concluding that J.L. would be better off waiting until he had developed a stronger sense of security. The trial court did not abuse its discretion when it adopted these opinions, rather than the opposing views of Ms. Pinto. Substantial evidence supported its order terminating family therapy because of its detrimental impact on J.L.

16

Here, the most common reunification services were not available because of the trial court's findings that both visitation and family therapy were detrimental to J.L. Even with those limitations, DSS continued to provide services designed to encourage reunification. Both Y.L. and J.L. were provided individual therapy. J.L.'s social workers frequently spoke with him about Y.L., her new stable lifestyle, her love for him and her desire to spend time with him. His foster mother did the same. Social workers encouraged J.L. to consider reconnecting with Y.L. by delivering gifts from her and encouraging letter writing and emailing between them. These efforts have been unsuccessful to date, but that does not render them unreasonable.

The finding of detriment is what distinguishes this case from *In re Hunter S., supra,* 142 Cal.App.4th 1497, and *In re S.H., supra,* 111 Cal.App.4th 310. That finding was not based on a child's temper tantrum or petulant refusal to communicate. It was based on the advice of J.L.'s therapist, the recommendation of his psychological evaluator, and his emotional and physical response to the prospect of being reunited with Y.L. Given the finding of detriment, the trial court properly declined to order visitation or continued family therapy. Reunification services were reasonable under the circumstances because more typical services, including visitation and family therapy, could not be provided without causing detriment to J.L.

*Disposition*

The petition for extraordinary writ is denied.

17

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.


We concur:


PERREN, J.


TANGEMAN, J.

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

Theresa G. Klein, for Petitioner.

No appearance for Respondent.

Rita L. Neal, County Counsel, Jenna Morton, Deputy County Counsel, for Real Party in Interest.