Filed 6/30/23  In re R.O. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.O. et al., Persons Coming Under the Juvenile Court Law. | B315213, B320219 (Los Angeles County Super. Ct. No. 21CCJP03245A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff,<br><br>v.<br><br>L.O.,<br><br>Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Minors.

_____

The juvenile court denied visitation to appellant L.O. (Father) at disposition and continued to do so when it terminated dependency jurisdiction.  (Welf. & Inst. Code, § 362.4.)[1]  The record shows the children fear and refuse to see Father, who beat them with a belt.  They have nightmares triggered by his abuse and were traumatized by witnessing his suicide attempt and seeing him point a gun at the head of a half sibling.  After the court sustained a petition against him, Father refused to acknowledge their pain, did not comply with the case plan, and made no progress to reunify with them.  The evidence supports a finding that visits would be detrimental to the children.  The court did not abuse its discretion by denying visits.  We affirm.

## FACTS AND PROCEDURAL HISTORY

Father and his ex-wife A.B. (Mother) have two sons, respondents Ru. (born in 2010) and Ra. (2012).  The family was reported for child abuse and neglect from 2012 to 2018.  Los Angeles County Department of Children and Family Services (DCFS) deemed the reports unfounded or inconclusive.

_____

[1] Undesignated statutory references in this opinion are to the Welfare and Institutions Code.

2

Respondents lived with Father while Mother struggled with homelessness and addiction.[2] After she completed rehabilitation in 2020, Father left the children with her, saying he could no longer care for them. A 2021 family court order gave the parents joint custody.

### *Detention*

In July 2021, DCFS received a report that Father calls the children names, hits them, slapped Ra.'s face, and threatened them. The children have nightmares: Ru. sleepwalks and screams, and Ra. cries in his sleep. Ra. is "terrified" of Father, saying that he has a gun. Father was arrested after a high-speed chase in February 2021, yet the family court gave him custody of respondents a few months later. Father abused Mother during their relationship. She believes he uses drugs.

Ru. said Father " 'yells, blames me for everything and hits me' " with a belt or hand, leaving bruises on Ru.'s arms and legs, and does " 'the same thing to my little brother.' " Father keeps a gun in an unlocked box in the house or car, and fights with his domestic partner Patty; Ru. said " 'the yelling never stopped.' " Ru. saw Father hold a gun to half sibling Paul's head and threaten to pull the trigger while they were in the car. Father believes people are watching him and want to hurt him. Distraught when Patty left him, Father attempted suicide. Ru. saw Father "hanging from the ceiling fan with a rope and the fan chain wrapped around his neck." Ru. said " 'my dad tried to hang himself' " and living with him was " 'like the Devil and hell.' "

---

[2] In 1999, Mother's oldest child tested positive for PCP at birth; her drug abuse ultimately caused her to lose custody of respondents' half siblings. Mother and DCFS are not parties to this appeal.

3

Father used a blade to cut Ru.'s hair, leaving " 'blood all over my head.' " Near tears during his interview, Ru. feared he would never recover emotionally from living with Father.

Ra. told a social worker (CSW) that Father was " 'crazy, chasing and watching people that he thought were after him.' " Ra. witnessed Father's suicide attempt and saw " 'a rope around my dad's neck.' " Ra. saw Father purchase a gun from a friend and point it at half sibling Paul, saying " 'he was going to put a hole in his head.' " Father sleeps with the gun. Ra. told CSW that Father smokes drugs and " 'went crazy.' " Ra. is "scared" of Father and planned to "run away from father's home and find his way back to mother's home."

Father felt " 'overwhelmed' " when he left the children with Mother in 2020. He admitted to a car chase in 2021 in which he struck another car and had a stand-off with police; felony charges are pending. He has many drug convictions and imprisonments. He denied physical discipline of the children or drug use, saying he last used methamphetamine in 2012. He denied attempting suicide in the children's presence. Patty's criminal history includes use and sale of methamphetamine.

DCFS secured an order to remove the children from Father. Ru. said, " 'I'm so happy. I don't want to go back to my dad's, I'm scared.' " Ra. agreed, " 'I'm so happy too.' " Mother takes them to therapy to address their emotional issues.

### *Petition*

DCFS filed a petition. As amended, it alleges that Father physically abused respondents by striking and bruising them with a belt and his hands, and left Ru. bleeding and in pain by using a blade to cut his hair; Father's mental and emotional problems—paranoia, erratic behavior, agitation, homicidal

4

ideation, and a suicide attempt in the children's presence—leave him unable to care for them and endanger their safety; he keeps a loaded gun within the children's access and pointed it at the head of their half sibling; he has a 28-year history of abusing alcohol, marijuana, cocaine and methamphetamine, and used drugs while caring for the children; he has multiple drug convictions, is a registered narcotics offender, and was arrested for driving against traffic, evading arrest, and making criminal threats.

At the detention hearing on July 16, 2021, the court removed respondents from Father, finding a substantial danger to their physical and emotional health. Based on their fear of Father, and his alleged abuse, the court denied Father visits pending adjudication but allowed monitored telephone contact. Mother submitted to the court's jurisdiction.

### *Jurisdiction and Addendum Reports*

The jurisdiction report details the parents' history of drug abuse and crime, Mother's failure to reunite with her older children, and prior reports about her abuse of respondents. Mother said Father choked her when she was pregnant with Ru, and later hit her while she held Ru. She lied about her history with DCFS, saying that only one child was a dependent of the court and no drugs were involved. Father admitted to a history of drug use and crime. He denied current drug use or domestic violence.

Eleven-year-old Ru. told CSW, repeatedly and loudly, " 'I don't want nothing to do with [Father]!' " Father underfed the children and gave them food that had gone bad. Ru. has a " 'really good' " relationship with Mother, who " 'does not hit me like dad did,' " feeds him, and takes care of him. Ru. takes

5

medication to cope with nightmares about Father.  If returned to Father, Ru. " 'would run away and hide forever and not be found. If I were to be found, I would leave again.' "  Ru. never felt safe with Father, who " 'beats me hard with the belt.' "  Once, when police came, Ru. said nothing " 'because I did not want to get hurt by my dad,' " who " 'hits us for no reason.' "  He does not want to see Father, even with a monitor.

Ru. told CSW that Father " 'hits me with his hands and belts everywhere, every single day.' "  Ru. insisted that he was telling the truth.  Asked if he sustained injury, Ru. said Father hit him in the nose and " 'he made me bleed every time he hit me,' " but never took Ru. to the doctor.  Ru. had bruises on his head, body, legs, and arms.  Father would not stop even when Ru. cried and asked him to stop.  Patty was there and said nothing. Ru said Father, " 'would hit me for no reason.' "  The abuse began when the children moved in with Father three years earlier.  He saw Father hit Patty with a metal bat.

Ru. said Father " 'tried to hang himself in the middle of summer.' "  He heard Patty screaming " 'don't do it!' " during an argument; Father replied, " 'fuck you, fuck you!' "  Father locked the door but Patty broke a window to enter the room.  Ru. saw Father sitting on the bed, with " 'a rope hanging from the top.' " The children were so scared that they did not eat the entire day.

The children said Father keeps a gun and showed them how to use it.  They saw Father point the gun at half sibling Paul; when they arrived home, Father hit the children and said he was going to kill Paul because he believed Patty and Paul were having an affair.  Ru. said, " 'We got scared and locked ourselves in the room.' "  Mother said Father admitted telling the children

that he was going to put a hole in Paul's head, and that Father has guns because he is a gang member.

Father disclaimed gun ownership, observing that it would be illegal for him, as a felon, to own a gun. He claimed not to have a phone number for his son Paul. As a result, CSW was unable to interview Paul about the petition.

Ra. said Father talks to himself and asks if they see things that are not there. Ra. believes Father thought " 'we were the reason why he was arguing with Patty and trying to hang himself.' " Mother said Father threatened suicide; she believes it is because he uses drugs.

Nine-year-old Ra. said he was so traumatized by living with Father that he cannot sleep alone. Father yells and " 'whoops' " them. Ra. feels unsafe with Father. By contrast, Mother " 'loves us, takes care of us and [does] not fight us.' " Ra. does not want to visit Father, who hit him with a belt, sandal, and hand. Ra. said he was hit several times per week, adding " 'he would hit my brother [Ru.] first and then he would hit me for no reason.' " Father calls them " 'little basters.' "

Mother said Father admitted to hitting the children " 'for no reason.' " She did not witness the beatings but saw marks and bruises on them, and they were " 'super skinny.' " They have nightmares but are calming down and improving with therapy.

Father said all the claims are " 'false' " and he has never hit his children. He spanked Ra. for cursing, saying, " 'If I ever put my hands on [Ra.] it was because he needed to know right from wrong, but it was only one time.' " Father was tearful. He denied hitting them with a belt and accused Mother of brainwashing them. He left them with her while repairing his relationship

with Patty, then Mother refused to give them back.  Father denied a suicide attempt.

In an addendum report pertaining to new allegations about Father's drug use, Ru. said that at Christmas 2020, there was a family argument about Father's drug use; police were called. Afterward, said Ru., "my dad hit us with the belt for no reason when we got home."  Ra. told CSW, " 'Patty smokes, but we do not know what.  I never seen dad use, but we know that he uses drugs and gets super high.' "

Mother told DCFS that Father called her in 2020, while high, and asked her to take the children.  He becomes paranoid when using drugs.  During their marriage, he threatened to blow up the house and pointed a gun at her while she was holding Ru. She completed a drug program and is sober.

Father said, "I used marijuana, meth, cocaine and alcohol in the past," and became sober in a drug program.  He "cooked" and sold methamphetamine, which he last used in 2020.  He described his drug and prison history, and charges of evading police in 2021.  He denied hurting the children or himself.

### *Adjudication and Disposition*

At adjudication on September 10, 2021, respondents' counsel asked the court to sustain the petition.  The children consistently said Father physically abused them.  They are traumatized by the abuse and suffering mental health problems as a result.  Mother saw bruises and the children said they bled. "They are terrified of their father, and this is a result of the physical abuse."  Father's denials are not credible.  They saw Father attempt suicide; talk to himself; ask them if they saw things that did not exist; hit Patty with a metal bat; and hold a gun to Paul's head and threaten to shoot.  Father has mental

8

health issues and admittedly used methamphetamine in 2020, while the children were in his care. The children are at major risk. Counsel said that everything respondents described is based on their personal knowledge, not coached.

Father denied all allegations of physical abuse, claiming Mother coached them to void the family law court's joint custody order. He denied mental health problems and current drug use.

The court found "abundant evidence" to support the petition and said, "I find that the children are credible. I find there is no evidence of coaching." They are consistent in their descriptions of physical abuse, exposure to Father's gun, and his suicide attempt. If there was inconsistency in the frequency of the abuse, that "is because it was ongoing. It wasn't just a few specific incidents that they can call to mind. . . . I further find that they are credible because they are displaying the trauma. They are displaying fear of the father; they are very, very clear that they are afraid to go back to father." The children's nightmares and visceral reaction to raised voices "is consistent with a child that has suffered physical abuse."

The court said, "I do not find the Father's across-the-board denial of physical abuse to be credible at all." The children's exposure to his suicide attempt is "extraordinary." Father admittedly panics and tries to numb himself when exposed to stress. He "displays paranoia," talks to himself, and "turns to substance abuse when he is stressed out." Further, Father "does show signs of homicidal tendencies" by pointing a gun at his son and attacking his girlfriend with a bat, and "the children should not have been exposed to this." The children were very credible about seeing Father's gun and know how he stores it. Father, a registered narcotics offender, is still in treatment.

The court sustained the petition as pleaded and found the children are persons described by section 300. Moving to disposition, it declared the children dependents of the court. Over Father's objection, it removed the children from him due to the substantial danger to their well-being in his home. It found that "Father's mental health problems are interlinked with his substance abuse, and it is going to take a lot of work by Father to work on both of those." His total denial of physical abuse also requires work.

The court placed the children in Mother's care and custody, under DCFS supervision. It ordered Father to participate in random or on-demand drug testing, and a full drug treatment program if any tests are missed or dirty; a 52-week parenting program, "given the severity of the physical abuse here"; and individual counseling to address case issues.

Respondents' counsel asked the court to find that visits would be detrimental, even if monitored, because the children are terrified of him and working through their fears in therapy. The court stated that the jurisdiction report documents the extent of the abuse and the children's trauma. It found clear and convincing evidence of detriment if the children visit Father. Over Father's objection, it ordered no visits and set a progress hearing to reassess this order. The court denied Mother's request to terminate jurisdiction, saying the children need services and Mother must be monitored.[3]

---

[3] Father's appeal from the disposition order (B320219) was consolidated with his appeal from the order terminating dependency jurisdiction and denying visitation (B315213). Father does not challenge the sustained petition charges.

### *Postdisposition Reviews*

Father was a "no show" to six drug tests from September 20 to December 1, 2021, but claimed he attends an outpatient drug program. Ru. told his therapist that he wants nothing to do with Father; Ra. told his therapist that "he hates his dad and does not want to see him or talk to him." They "consistently vocalized to CSW . . . that they do not want to see [Father] nor wish to speak to him."

The court denied Father's request to vacate its detriment finding at a hearing on December 10, 2021. It ordered DCFS to detail Father's progress in parenting classes and counseling; contact Father's outpatient drug program; and interview respondents and their therapists about their fear of Father.

In January 2022, Ru. told CSW that he fears visiting Father because " 'He's going to hit me, and it will traumatize me.' " He "has no interest in seeing the father." Similarly, Ra. said he feared visits because Father " 'is going to hit me.' " Neither child wished to discuss the topic, but both said they enjoy living with Mother, where they feel safe. Ra.'s therapist said he would experience anxiety if he were to see Father; she could not recommend visits. During therapy, Ra. drew a picture of Father, whose "face was crossed out with cuss words." Ru.'s therapist said he "has expressed a lot of fear and anxiety about seeing the father" but does not go into detail. They have "barely scratched the surface" of Ru.'s difficulties, but "it does not seem like a good idea for the child to have visitations with the father at this time, because the father is a trigger." Father did not enroll in counseling or a parenting program. His outpatient drug program did not return CSW's calls.

On February 3, 2022, the court found no change in circumstances warranting visitation and "continuing detriment." It ordered the therapists to address respondents' trauma and work toward visitation.

In advance of the six-month review hearing, DCFS recommended terminating dependency jurisdiction, giving sole custody to Mother and no visits for Father. Its report states that the children are well nourished and healthy; they are supervised by their aunt while Mother works. Neither child has anything negative to say about living with Mother. Ru. told CSW he refuses to see Father, who would hit him and Ra. with a belt or pull his hair. He fears Father and is not amenable to visits, even if monitored, as it would traumatize him. He no longer requires medication to focus. Ra. continued to say that he does not want any contact with Father because he would "get a panic attack." Ra. saw a vehicle resembling Father's car and a person resembling Father out in the community, and worried that Father might follow them home.

Father acknowledged receiving referrals from DCFS but did not enroll in any court-ordered programs or participate in drug testing. He missed nine drug tests from September 2021 to February 2022. He wishes to have the children back. He denies using physical discipline, saying he only gave them chores or confiscated electronic devices when they misbehaved. His drug counselor still failed to return calls.

Mother is attuned to the children and follows DCFS's recommendations. She expressed concern that the children threaten to run away if forced to be with Father. Ra.'s therapist said he continues to deny wanting to see Father but refuses to

12

discuss it; she and Ru.'s therapist suspect that Mother may be coaching the children.

### *Termination of Jurisdiction*

At the review hearing on March 11, 2022, respondents joined DCFS in recommending termination of jurisdiction, with no visits for Father. Their counsel denied that they are being coached: In client meetings, they shared specific details about Father's maltreatment and their demeanor was sincere. Father never acknowledged any wrongdoing, did not comply with his case plan, and made no progress to address case issues or repair his relationship with the children.

The court found that the conditions justifying the initial assumption of jurisdiction no longer exist and are unlikely to exist if supervision is withdrawn. It terminated jurisdiction, with Mother having sole physical and legal custody. Over Father's objection, the court found no new evidence to change the prior finding of detriment, noting "severe physical abuse, [along with] Father's mental health and drug abuse problems," and Father's unwillingness to address the issues. Detriment remains and there is no sufficient evidence of coaching. Father failed to undergo a six-month drug program with after-care and testing; a parenting program; and counseling. Mother may allow visits if the children express interest.

### DISCUSSION

#### 1. Appeal and Review

The disposition and the order terminating jurisdiction and denying visitation are appealable. (§ 395.) We construe the record in the light most favorable to the order; draw all reasonable inferences to support the findings; and defer to the court's resolution of disputes and credibility assessments. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

13

"We review the juvenile court's finding that visitation would be detrimental under the substantial evidence standard." (*In re F.P.* (2021) 61 Cal.App.5th 966, 973.)  The court has discretion to deny contact if it finds detriment.  (*Ibid.; In re T.M.* (2016) 4 Cal.App.5th 1214, 1219.)  Abuse of discretion occurs if the court is arbitrary, capricious, or exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

### 2. The Appeals Are Not Moot

Respondents assert that Father's appeals are moot because no relief is available after the court ends dependency jurisdiction. "In juvenile cases, when an issue raised in a timely notice of appeal continues to affect the rights of the child or the parents, the appeal is not necessarily rendered moot by the dismissal of the underlying dependency proceedings.  [Citation.]  Rather, the question of mootness must be decided on a case-by-case basis." (*In re Hirenia C.* (1993) 18 Cal.App.4th 504, 517–518.)

Even after dependency jurisdiction ends, we may consider the appeal on the merits if the controversy could recur or the order "would create 'the possibility of prejudice in subsequent family law proceedings.' "  (*In re D.P.* (2023) 14 Cal.5th 266, 282; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488–1489 [reviewing a visitation order after dependency jurisdiction terminated].) Because the orders in this case affect Father going forward, we shall reach the merits of his appeals.

### 3. Denial of Visitation

At disposition, the juvenile court should endeavor to maintain ties between parent and child.  The court may deny parental contact "[i]f visitation is inconsistent with the well-being of the child, or would be detrimental to the child."  (*In re F.P., supra,* 61 Cal.App.5th at p. 973; *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1101–1102.)  "Well-being" includes "the

14

minor's emotional and physical health." (*In re T.M., supra,* 4 Cal.App.5th at p. 1219.)

The court need not "sit idly by while a child suffered extreme emotional damage caused by ongoing visits," even if visits are monitored. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357.) "[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.)

When the court terminates dependency jurisdiction, it determines custody and child visitation. (§ 362.4, subd. (a); *In re Armando L.* (2016) 1 Cal.App.5th 606, 616 [court determines the noncustodial parent's visitation rights].) The custody and visitation order—commonly referred to as an "exit order"—"shall continue until modified or terminated by a subsequent order of the superior court." (§ 362.4, subd. (b); *In re T.S.* (2020) 52 Cal.App.5th 503, 513 [order remains in effect in the family law action until modified or terminated].)

The court's primary consideration is the best interests of a child. (*In re T.S., supra,* 52 Cal.App.5th at p. 513.) "[V]isitation can be denied or suspended upon a finding of detriment to a child's physical or emotional well-being." (*In re F.P., supra,* 61 Cal.App.5th at p. 973.) The goal "is to provide maximum safety and protection for children" from physical and emotional abuse and a home "free from the negative effects of substance abuse is a necessary condition" for children's safety and physical and emotional well-being. (§ 300.2, subd. (a).)

15

### 4. The Record Supports Denial of Visitation

Substantial evidence supports the court's findings at disposition and in its exit order that visits with Father would be detrimental to the children and negatively impact their emotional well-being. Physical and emotional abuse are grounds to deny visits. (*In re F.P., supra,* 61 Cal.App.5th at p. 974.)

The record shows Father was physically and emotionally abusive. He regularly hit the children with a belt and his hands, leaving bruises, for no reason other than meanness; he continued the abuse when they cried and asked him to stop; he caused bleeding by using a blade to cut his son's hair; he gave them access to a gun; in their presence, he attempted to hang himself and pointed a gun at a sibling; he did not feed them properly; he acted paranoid and "crazy," asking if they saw things that were not there; and he used methamphetamine while caring for them. These issues led to the sustained petition.

After the children were detained, they had nightmares triggered by living with Father. They refused contact with him, even with a monitor, throughout the proceeding. (*In re F.P., supra,* 61 Cal.App.5th at p. 974 [nightmares and refusal to have contact with an abusive parent are grounds to deny visits].)

At disposition, the court ordered Father to complete a case plan. He did not comply with it. He missed drug tests and failed to provide proof of enrollment in a drug program, parenting classes, and counseling. He denied all wrongdoing and claimed the children are coached; however, the court expressly found the children's accusations credible and disbelieved Father's denials. It found no sufficient evidence of coaching. The court found that in the six months following disposition, Father was "just not

16

willing to make an effort" to address his mental health and drug abuse problems.

Father posits that "monitored visitation would not be detrimental to his children" because a monitor "would ensure they felt safe that father could not harm them." It is not enough that a monitor can protect the children from being beaten, cut, unfed, yelled at, or threatened by a gun. Ample case law holds that a child's *emotional* health is a critical aspect of well-being, in addition to physical safety. (See, e.g., *In re T.M., supra,* 4 Cal.App.5th at p. 1219; *In re Brittany C., supra,* 191 Cal.App.4th at p. 1357; *In re S.H., supra,* 111 Cal.App.4th at p. 317; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.)

The record is replete with respondents' insistence that they are terrified of Father, do not want to see him with a monitor, and will run away if forced to see him. He triggers extreme anxiety. The court found they are traumatized. It left the door open to visits if Father completes a drug program, tests negative for drugs, and engages in counseling and a parenting program, and the children wish to see him.

This is not a case in which a parent was "less than ideal [or] did not benefit from the reunification services as much as we might have hoped." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) Father was affirmatively cruel and brutal. He did not benefit from services because he refused to enroll in them. He has a three-decade history of drug use and numerous drug convictions, admittedly using methamphetamine as recently as 2020 while caring for the children. There is no evidence showing he ceased using drugs because he refuses to test.

After reviewing the record, we conclude that Father's evidence was not uncontradicted or of such character and weight

17

that a court must find it sufficient as a matter of law. (*In re J.M.* (2023) 89 Cal.App.5th 95, 111.) Father suggests that respondents' accusations are not believable and they "were caught up in their parents' custody battle" and coached by Mother. The court decided these issues against Father. "It is not our function to weigh the credibility of the witnesses or resolve conflicts in the evidence." (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 839.) In sum, "we do not fault the court for determining [that] forced contact with [Father] may harm [the children] emotionally." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 581, overruled on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4.) The evidence of stress on the children supports the no contact order.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.


18